## JACKSON, ex dem. SMITH, against GOODELL.

The *Indian tribes within this state, are subject to the jurisdiction and laws of the state. These Indians are not aliens, but citizens, owing allegiance to the government, and entitled to its protection. They may acquire property, by purchase or descent, and aliene or transmit the same, as natural born citizens; subject, however, to such regulations as the legislature may prescribe, for their security against imposition and fraud.*

*A deed, therefore, executed in 1797, in the usual form, by the only son of an Indian, to whom lands had been granted by the state, for his services, as a soldier in the revolutionary war, claiming and holding the same, as heir to his father, is valid; there being at the time of the conveyance, no law of the state, disabling individual Indians, seised of real estate, from aliening their lands, or regulating the manner of their conveyance.*

THIS was an action of *ejectment*, brought to recover the possession of lot No. 33, in the township of *Junius*, in the county of *Seneca*, and was noticed for trial at the *Seneca* Circuit, in 1821, when the parties agreed to submit the cause to the opinion of the Court, on a case containing the following facts: Letters patent for the lot in question, and for another lot in *Junius*, dated *January* 29, 1791, were granted to Lieutenant *John Sagoharase*, an *Oneida Indian*, who served in the line of this state, in the army of the *United States*, in the revolutionary war, and

died *March* 27, 1783, leaving a son, named *William,* his only lawful issue, and who resided with the tribe of *Oneida Indians.* *William,* the son of the patentee, in 1797, in consideration of 250 dollars, conveyed lot No. 33 to *Peter Smith,* the lessor of the plaintiff, in fee; and the deed was regularly proved and recorded, on the 16th of *September,* 1797. He, *William S.,* afterwards, on the 6th of *May,* 1810, for the consideration of 300 dollars, executed a deed, in fee, for the same lot, to *Elijah Miller,* which deed was acknowledged by the grantor, and approved by the Surveyor General, in pursuance of the act in such case made and provided. The defendant was in possession of the lot, claiming title under *E. Miller;* and before the suit was commenced, the lessor of the plaintiff demanded the possession, and to have the improvements on the lot appraised, according to the statute of *April* 8, 1813, and the defendant refused to join in such appraisement.

It was agreed, that if the Court should be of opinion that the plaintiff is entitled to recover, the defendant might enter up judgment as upon a specia verdict containing the above facts; and in case the Court should be of opinion in favour of the defendant, the plaintiff was to be at liberty to enter judgment as upon a special verdict containing the same facts.

*D. Cady,* for the plaintiff.

*E. Miller,* for the defendant.

SPENCER, Ch. J. delivered the opinion of the Court.

In the case of *Jackson* v. *Sharp,* (14 *Johns. Rep.* 472.) it was decided, that an *Indian* patentee might aliene lands granted to him individually; and it was held, that a conveyance by an *Indian* patentee, given in the year 1791, was valid, effectual, and operative, to vest all his right in the grantee. We were of opinion that the inhibition in the constitution against the purchase of lands from *Indians,* as well as the act of the 18th of *March,* 1788, related solely to purchases of land from *Indians,* as a tribe, or community, and did not extend to a case of individual ownership. We

were of opinion, also, that the case of *Jackson* v. *Wood*, (7 *Johns. Rep.* 290.) was decided under the act of 1801. (1 *R. L. K. and R.* 464.) In the latter case, the deed from the *Indian* was posterior to the act of 1801. But in the case of *Jackson* v. *Sharp*, the deed from the *Indian* was in 1791. In the present case, the deed under which title is deduced, was executed by the son and only child of the *Indian* patentee, to the lessor of the plaintiff, on the 10th of *September*, 1797; so that this case must be decided independently of the act of 1801, or any subsequent legislative enactment; and the question is, simply, whether a legitimate child of an *Indian*, holding property by grant from the state to him individually, is to be regarded as his *heir*, so far as to take by inheritance; and this involves the inquiry whether an *Oneida Indian* is to be considered a citizen of the state, or an alien?

By the 55th section of the act (2 *N. R. L.* 175. sess. 36. ch. 92.) the heirs of *Indians* to whom lands had been granted by this state for military services in the then late war between the *United States* and *Great Britain*, were made capable of taking and holding any such lands by descent, in the same manner as if such heirs were citizens of this state, at the death of his, her, or their ancestors; and it is further provided, that every conveyance hereafter to be executed, by such patentee or his heirs, to any citizen of this state, shall be valid, if executed with the approbation of the Surveyor General, to be expressed by an indorsement on such conveyance, and signed by the Surveyor General; with a proviso, that nothing in the act shall in any manner confirm any deed or conveyance theretofore executed by the patentee or his heirs. This act was passed in 1813. Although the act is not a declaratory one, yet it is manifest, that the Legislature must have supposed, either that an *Indian* heir could not take by descent, and could not aliene without legislative provision; or they must have considered it a doubtful case, requiring some legislative enactment, to remove a supposed disability on the part of the *Indian* heirs. We are now, however, required to pronounce upon their condition antecedently to this act. In the case of *Jackson* v. *Wood*, the then Chief Justice, *Kent*, threw out some general

remarks on the state of the *Oneida Indians.* He observed, that their political relation to this state was peculiar, and *sui generis;* and that if they were not aliens in every sense, because of their dependence as a tribe, and their right to protection, they could not be considered as subjects born under allegiance, and bound, in the common law sense of the term, to all its duties. But no direct or decided opinion was intended to be expressed by the learned Judge, or by the Court, whether the issue of an *Indian,* dying seised of land, could take by descent; for the case did not call for such opinion.

Natural born subjects are defined, by *Blackstone,* (1 *Bl. Com.* 366.) to be " such as are born within the dominions of the crown of *England;* that is, within the ligeance of the king." " Allegiance is the tie, or *ligamen,* which binds the subject to the king, in return for that protection which the king affords the subject." Allegiance, both express and implied, is of two sorts : the one natural, the other local; the former being perpetual, the latter temporary. Natural allegiance is such as is due from all men born within the king's dominions, immediately upon their birth; for, immediately upon their birth, they are under the king's protection. Natural allegiance, he says, is perpetual; and for this reason, evidently founded on the nature of government; that allegiance is a debt due from the subject, upon an implied contract with the prince, that so long as the one affords protection, so long the other will demean himself faithfully. Natural born subjects have a great variety of rights, which they acquire by being born within the king's ligeance, which can never be forfeited, but by their own misbehaviour ; but the rights of aliens are much more circumscribed, being acquired only by residence, and lost whenever they remove. " If an alien," he says, " could acquire a permanent property in lands, he must owe an allegiance equally permanent to the king, which would probably be inconsistent with that which he owes his natural liege lord ; besides, that thereby the nation might, in time, be subject to foreign influence, and feel many other inconveniences. It is on these principles that an alien, when he purchases lands, cannot hold them, if the government see fit to proceed for an es-

ALBANY,
August, 1822.

JACKSON
v.
GOODELL.

cheat, and that he is absolutely precluded from taking by descent, having no heritable blood."

These *Indians* are born in allegiance to the government of this state, for our jurisdiction extends to every part of the state; they receive protection from us, and are subject to our laws.     Indeed, our Legislature regulate, by law, their internal concerns, and exercise entire and perfect control over them.    By an act of the last session of the Legislature, (sess. 45. ch. 204.) it is enacted, that the sole and exclusive jurisdiction of trying and punishing all and every person, of whatever nation or tribe, for crimes and offences committed within any part of this state, except only such crimes and offences as are cognizable in Courts deriving jurisdiction under the constitution and laws of the *United States*, of right, belongs to, and is exclusively vested in, the Courts of justice of this state.    The preamble to this act recites, that the *Seneca* and other tribes of *Indians* residing within this state, have assumed the power of trying and punishing, and in some cases capitally, members of their respective tribes, for supposed crimes by them done and committed in their respective reservations, and within this state.    It further recites, that the sole and exclusive cognizance of all crimes and offences committed within this state, belongs, of right, to Courts holden under the constitution and laws thereof, as a necessary attribute of sovereignty. The act proceeds to pardon *Tommy Jemmy*, otherwise called *Soo-non-gize*, an *Indian* of the *Seneca* tribe, for the murder of an *Indian* woman, alleged to have been committed within the *Seneca* reservation.    This statute not only asserts the exclusive jurisdiction of this state over all crimes or offences committed within the *Indian* reservations; but it expressly negates any jurisdiction to the *Indian* tribes, to take cognizance of offences committed therein, even by those of their own tribes.    If, then, our jurisdiction exclusively reaches them, if they have no right to punish offences, if they receive protection from our government, are subject to our legislation, being born within the state, they must owe to this government a permanent allegiance; and they cannot be aliens.    It does not affect the question, or make them less citizens, that we do not tax them, or require military

or other services from them. This is a mere indulgence arising from their peculiar situation. For a long succession of years, we have exercised an entire supremacy over all the tribes within the state, and have regulated by law their internal concerns, their contracts, and their property. In one sense only, they may be considered as having the semblance of national rights, as regards their right to retain to their own use, or to dispose, under the regulations of our government, of their lands. In every other sense, they are as completely the subjects of our laws as any other citizens; and we must conclude, that they are citizens. When, therefore, the Legislature attempted to impart to them the right of inheritance, they conferred no new right, for they had already acquired it. We do not mean to say, that the condition of the *Indian* tribes, at former and remote periods, has been that of subjects, or citizens of the state. Their condition has been gradually changing until they have lost every attribute of sovereignty, and become entirely dependant upon, and subject to our government. I know of no half-way doctrine on this subject. We either have an exclusive jurisdiction, pervading every part of the state, including the territory held by the *Indians,* or we have no jurisdiction over their lands, or over them, whilst acting within their reservations. It cannot be a divided empire; it must be exclusive, as regards them, or us; and the act referred to, as well as the actual state and condition of the *Indian* tribes within this state, shows that the jurisdiction is in the state, and, consequently, upon the principles of the common law, they must be citizens. This being the case, *William Sagoharase* took the lot in question by descent, as heir to his father, *John Sagoharase,* to whom it had been granted in 1791, for military services; and *William,* the heir, having aliened it, prior to any statute disabling an *Indian* individually seised of real estate, from aliening his lands, the lessor of the plaintiff acquired a legal title thereto. It is not intended to question the power of the Legislature to regulate the manner in which *Indians* are to convey their property, real or personal. They may treat them as wanting discretion to manage their property, and devise guards and checks against frauds upon them. But nothing of this kind had

been done, when the deed, under which the plaintiff claims, was executed, and it must, therefore, prevail.

Judgment for the plaintiff.