## COURT OF APPEALS,

### June 16, 1914.

# THE PEOPLE ex rel. WEBSTER CUSICK v. DENNIS W. DALY, SHERIFF OF NIAGARA COUNTY.

### (212 N. Y. 183.)

(1.) INDIANS*—JURISDICTION OF COURTS—SOVEREIGNTY OF FEDERAL GOVERNMENT OVER INDIANS AND INDIAN TRIBES LIVING UPON RESERVATIONS WITHIN THE STATE OF NEW YORK.

While the state of New York has enacted laws conferring upon Indian tribes certain powers to regulate their own affairs, and to protect their lands from invasion (Indian Law, Cons. Laws, ch. 26), the Federal government has never relinquished its suzerainty over them. Congress has always asserted and exercised the right to legislate in all Indian affairs, and its power to do so has been upheld by the Supreme Court. The jurisdiction of our state courts must give way before the higher authority which this statute vests in the Federal courts.

(2.) SAME—COURTS OF THIS STATE HAVE NO POWER TO TRY AN INDIAN FOR A CRIME COMMITTED UPON THE PERSON OF ANOTHER INDIAN WITHIN THE BOUNDARIES OF THE RESERVATION OF THE TRIBE OF WHICH BOTH ARE MEMBERS.

The courts of this state have no power to try an Indian for the offense of assault with intent to kill committed upon the person of another Indian within the boundaries of the reservation of the tribe of which both are members. By virtue of the provisions of the 9th section of the Federal act of 1885 (23 U. S. Stat. at Large, 385, now section 328 of the U. S. Crim. Code) the courts of the United States have been vested with exclusive jurisdiction of that crime. There is no difference as to the application of this rule between the Indians whose reservations are the direct gift of the Federal govern-

---

* See Note on Indians, vol. 30, p. 327.

ment and those whose reservations have been derived from the state or from other sources.

(3.) SAME—PARAMOUNT JURISDICTION OF FEDERAL COURT OVER SUCH CRIMES.

The relator, a Tuscarora Indian, lived with the other members of his tribe on its reservation in Niagara county in this state. He was arrested on a warrant charging that while on said reservation, and armed with a dangerous knife, he attacked another Indian with intent to kill and was committed to the county jail to await the action of the grand jury. Thereupon he sued out a writ of habeas corpus, upon the plea that his arrest and detention were illegal because the United States courts had exclusive jurisdiction to try him for the offense with which he was charged. *Held*, that the power of the state must yield to the paramount authority of the Federal government.

*People ex rel. Cusick* v. *Daly*, 158 App. Div. 892, reversed.

APPEAL from an order of the Appellate Division of the Supreme Court in the fourth judicial department, entered July 17, 1913, which affirmed an order of Special Term dismissing a writ of habeas corpus and remanding the relator to custody.

The facts, so far as material, are stated in the opinion.

*William E. Lockner* for appellant. The crime of assault with intent to kill is and since 1885 has been exclusively cognizable by the United States District Court, and our state court has neither jurisdiction nor authority to hold relator to trial under its indictment. The Federal act is all-inclusive and exempts no tribe having a reservation from its provisions. (U. S. Crim. Code, § 328; *U. S.* v. *Kagama*, 118 U. S. 375; *U. S.* v. *Celestine*, 215 U. S. 279; *Matter of Lincoln*, 129 Fed. Rep. 247; *Peters* v. *Malin*, 111 Fed. Rep. 245; *Matter of Blackbird*, 109 Fed. Rep. 139; *U. S.* v. *Logan*, 105 Fed. Rep. 240; *U. S.* v. *King*, 81 Fed Rep. 625; *U. S.* v. *Thomas*, 151 U. S. 577; *Worcester* v. *Georgia*, 6 Pet. 519; *Ryan* v. *Knorr*, 19 Hun, 543; *Barker* v. *Johns*, 38 Hun, 628; *N. Y. Indians* v. *U. S.*, 170 U. S. 8; 173 U. S. 468.) Under the constitutional power

to regulate commerce with the Indian tribes, and under the treaty power, the general government had the right to intervene and assume control over all the lands lying within the limits of any state, occupied by any nation of Indians, still retaining to any extent its tribal relations, and this control and jurisdiction since the passage of the act in 1885 has been exclusive. (*Matter of Blackbird*, 109 Fed. Rep. 139; *State* v. *Campbell*, 53 Minn. 354; *Donnelly* v. *United States*, 228 U. S. 243; *Fellows* v. *Denniston*, 23 N. Y. 427; 72 U. S. 761; *United States* v. *Partello*, 48 Fed. Rep. 671; *United States* v. *Celestine*, 215 U. S. 279; *United States* v. *King*, 81 Fed. Rep. 625; *United States* v. *Barnaby*, 51 Fed. Rep. 20; *United States* v. *Bridleman*, 7 Fed. Rep. 894.)   It is error to deny that this reservation is within the meaning of the Federal act after over 100 years of recognition as an independent tribal reserve by the state and the United States.   (*Minnesota* v. *Hitchcock*, 185 U. S. 373; *Spalding* v. *Chandler*, 160 U. S. 394; *Donnelly* v. *United States*, 228 U. S. 243; *Ogden* v. *Lee*, 6 Hill, 549; 5 Den. 529; *Seneca Nation* v. *Appleby*, 196 N. Y. 323; *N. Y. Indians*, 5 Wall. 767; *Godfrey* v. *Beardsley*, 2. McLean, 416; *Seneca Nation* v. *Tyler*, 14 How. Pr. 112; *People* v. *Dibble*, 16 N. Y. 218; *Terrance* v. *Crowley*, 62 Misc. Rep. 141.)

*Fred M. Ackerson* and *John Lord O'Brian* for respondent. The courts of the state of New York have jurisdiction to enforce the criminal process of that state upon the so-called Tuscarora reservation.   (*Matter of Wolf*, 27 Fed Rep. 606; *United States* v. *Keya*, 126 Fed. Rep. 879; *Benson* v. *U. S.*, 44 Fed. Rep. 178; *Hatch* v. *Luckman*, 64 Misc. Rep. 508.)   The so-called Indian reservations are integral parts of the state of New York forming parts of counties, townships and villages over which the state jurisdiction exists and has always been recognized and enforced.   (*Matter of Wolf*, 27 Fed. Rep. 606;

*United States* v. *Keya*, 126 Fed. Rep. 879; *State* v. *Campbell*, 53 Minn. 354; *United States* v. *Thomas*, 151 U. S. 577.) The Federal government never had any title to the lands comprising the Indian reservations in the state of New York, and never had any authority, either from statute or from the Constitution, to oust the state of its jurisdiction over these reservations. (*People* v. *Pierce*, 18 Misc. Rep. 83; *Jamison* v. *Bell Telephone Co.*, 186 N. Y. 498; *Seneca Nation* v. *Christie*, 126 N. Y. 122; *Peters* v. *Tallchief*, 121 App. Div. 309; *Matter of Printup*, 121 App. Div. 322.)

WERNER, J.:

The relator is a Tuscarora Indian, living with the other members of his tribe on its reservation in Niagara county in this state. On August 19th, 1912, he was arrested on a warrant issued by a justice of the peace of the town of Lewiston in that county, charging that the relator, while on said reservation and armed with a dangerous knife, attacked another Indian with intent to kill. The relator was committed to the county jail to await the action of the grand jury.

Thereafter he sued out a writ of habeas corpus, upon the plea that his arrest and detention were illegal because the United States courts had exclusive jurisdiction to try him for the offense with which he was charged. Upon the return to the writ a hearing was had at Special Term, the writ was dismissed, and the relator remanded to custody. This disposition of the proceeding was affirmed at the Appellate Division, and the matter is now before this court on the relator's appeal.

The question to be decided is whether the courts of this state have power to try an Indian for the offense of assault with intent to kill committed upon the person of another Indian, within the boundaries of the reservation of the Tuscarora tribe of which both are members. The relator's counsel contends that

by virtue of the provisions of the 9th section of the Federal act of 1885 (23 U. S. Stat. at Large, 385; now section 328 of the U. S. Crim. Code) the courts of the United States have been vested with exclusive jurisdiction of the crime of which the relator is charged. This section reads as follows:

" That immediately upon and after the date of the passage of this act, all Indians committing against the person or property of another Indian or other person any of the following crimes, namely: murder, manslaughter, rape, *assault with intent to kill,* arson, burglary and larceny, within any Territory of the United States, and either within or without the Indian Reservation, shall be subject therefor to the laws of said Territory relating to said crime, and shall be tried therefor in the same courts and in the same manner, and shall be subject to the same penalties, as are all other persons charged with the commission of said crimes, respectively; and the said courts are hereby given jurisdiction in all such cases; and all such Indians committing any of the above crimes against the person or property of another Indian or other person, *within the boundaries of any State of the United States, and within the limits of any Indian reservation, shall be subject to the same laws, tried in the same courts and in the same manner, and subject to the same penalties, as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States.*"

The Federal statute of 1885 was evidently enacted to remedy the conditions which resulted from the decision of the United States Supreme Court in *Ex parte Crow Dog* (109 U. S. 556) rendered in December, 1883. (Donnelly v. U. S., 228 U. S. 243, 270.) In Crow Dog's case it was held that an Indian, who had murdered another Indian in the Sioux reservation in the then territory of Dakota, would not be punished by the courts under the statutes and treaties as they then ex-

isted, and under which offenses committed by one Indian against another were dealt with by each tribe according to its local customs. '(*Ex parte Crow Dog*, 109 U. S. 571, 572.) This enactment superseded the rule laid down in Crow Dog's case, by vesting the Federal courts with jurisdiction over such of the more serious crimes as the savage nature of the Indian would lead him to commit, and for the punishment of which the tribal regulations and tribunals were probably regarded as inadequate.

It is to be observed that the statute consists of two distinct provisions. The first relates to the crimes therein enumerated when committed by Indians in a territory of the United States, whether within or without the precincts of an Indian reservation, and the second relates to such crimes when committed by Indians within the " boundaries of any state of the United States, and within the limits of any Indian reservation."

The constitutionality of this act was challenged in the case of U. S. v. Kagama (118 U. S. 375, 383) and the validity of both provisions was upheld. In that case the defendant was indicted for the murder of another Indian upon the Hoopa reservation in the state of California, and in sustaining the power of Congress to enact the statute, so far as it relates to crimes committed by Indians upon reservations lying within the boundaries of a state, Mr. Justice MILLER thus wrote for the Supreme Court: " Is this latter fact a fatal objection to the law? The statute itself contains no express limitation upon the powers of a state or the jurisdiction of its courts. If there be any limitation in either of these, it grows out of the implication arising from the fact that Congress has defined a crime committed within the state, and made it punishable in the courts of the United States. But Congress *has* done this, and *can* do it, with regard to all offenses relating to matters to

which the Federal authority extends. Does that authority extend in this case?

" It will be seen at once that the nature of the offense (murder) is one which in almost all cases of its commission is punishable by the laws of the states, and within the jurisdiction of their courts. The distinction is claimed to be that the offense under the statute is committed by an Indian, that it is committed on a reservation set apart within the state for residence of the tribe of Indians by the United States, and the fair inference is that the offending Indian shall belong to that or some other tribe. It does not interfere with the process of the state courts within the reservation, nor with the operation of state laws upon white people found there. Its effect is confined to the acts of an Indian of some tribe, of a criminal character, committed within the limits of the reservation.

" It seems to us that this is within the competency of Congress. These Indian tribes *are* the wards of the nation. They are communities *dependent* on the United States. Dependent largely for their daily food. Dependent for their political rights. They owe no allegiance to the states, and receive from them no protection. Because of the local ill-feeling, the people of the states where they are found are often their deadliest enemies. From their very weakness and helplessness, so largely due to the course of dealing of the Federal Government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the Executive and by Congress, and by this court, whenever the question has arisen."

We have quoted thus at length from the opinion in the *Kagama* case because the views there expressed bear so directly upon the question here involved. It will be noted that Mr. Justice MILLER laid some stress upon the facts that the reservation there was one set apart by the United States, and that

the tribes referred to were dependent upon the general government for their daily food.   Neither of these things is strictly true of our New York state tribes.   But these were not the controlling elements in the decision, as will be seen from a perusal of the whole opinion, for the power of the Federal authorities was asserted primarily because the Indian tribes in this country were, and always had been since the formation of the government, the wards of the nation and not of the states.

The learned justice who wrote at Special Term in the case at bar took the view that the word " reservation " as used in the statute was not intended to include such reservations as are occupied by the tribes of Indians still residing in this state, but that Congress had in mind only such lands as had been set apart for the use of the Indian tribes in the west by some action on the part of the United States government.   The Tuscarora Indians, it is true, received no part of their reservation from the United States government, and in this respect they are no different from the other tribes still resident here.   The Tuscaroras are kinsmen of the Senecas, and in earlier days formed the Sixth Nation of the once powerful Iroquois, who, in the height of their power, were the dominant tribes in this state and some of the contiguous territory.   At a remote period in their history the Tuscaroras separated from their kinsmen and emigrated to that part of our country afterwards included in the state of North Carolina.   They returned to this state as early as 1714 and settled finally in Niagara county, within the confines of the Seneca country, upon land allotted to them by the Seneca tribe.   This reservation was later enlarged by a grant from the Holland Land Company, and still later by the purchase of additional lands with moneys received from the United States authorities out of the sale of territory formerly occupied by the Tuscaroras in North Carolina.   (Report of Special Commission appointed by the N. Y. State Assembly

of 1888 to Investigate the Indian Problem, known as the
Whipple Report, pp. 12, 13 *et seq.*; History of the N. Y.
Iroquois by Beauchamp, contained in Bulletin 78 of N. Y.
State Museum [1905], pp. 263 *et seq.*; and see index under
title of Tuscaroras; U. S. Senate Executive Documents, 48th
Congress [1885], vol. 2, part 2, p. 520.)

Interesting as these facts may be to the student of history,
they have little bearing upon the question to be decided.  The
truth is that we are dealing with dual relations growing out of
peculiar conditions.  The state of New York has enacted laws
conferring upon these Indian tribes certain powers to regulate
their own affairs, and to protect their lands from invasion (see
Indian Law, Cons. Laws, Ch. 26), but the Federal govern-
ment has never relinquished its suzerainty over them.  As early
as the year 1784 the United States entered into a treaty with
the Six Nations in which the government expressly secured to
the Tuscaroras the possession of the lands on which they had
settled.  In 1789 and 1794 further treaties were made with the
Six Nations, again securing them in their lands.  In 1838 an-
other treaty was entered into at Buffalo creek, whereby the New
York state Indians agreed, in consideration of being given
lands in the west, to relinquish their claims to the reservations
here.  That arrangement was never concluded.  Another treaty
was made in 1842.  (Fellows v. Blacksmith, 60 U. S. 366; U.
S. Senate Documents, vol. 39, containing Treaties with Indians,
50th Congress, 2nd Session, 1903-1904, pp. 5, 23, 34 and 502.)
The Indian tribes still here are in charge of a United States
agent, and each year Congress doles out to them funds for their
support from moneys due under treaties and original appro-
priations.  (See Annual Reports of U. S. Commissioner of
Indian Affairs, Dept. of Interior.)

Under our dual form of government in which there are two
distinct sovereignties, Federal and state, each is supreme within

its appropriate sphere. They exercise their respective powers in the same territory, each being independent of the other, and each having its separate executive, legislative and judicial departments. This division of government, while simple in theory, frequently presents practical complexities which it is difficult to harmonize. One of our most troublesome problems has arisen over the *status* of the Indians in our political economy. They were the original occupants of our soil, and we have treated them as semi-independent nations, subject in some degree to both state and Federal laws. Although greatly diminished in numbers, and restricted to reservations which are insignificant remnants of their former hunting grounds, they have maintained their tribal relations and customs, according to which they are to some extent permitted to govern their own affairs. Yet they are not citizens either of the United States or of this state. The problem is further complicated by the fact that the history of some of the tribes within our own state differs widely from that of other tribes in other sections of the country. This is pointed out in a very interesting and instructive opinion recently delivered by Mr. Justice ANDREWS at the Trial Term of the Supreme Court. (George v. Pierce, 85 Misc. Rep. 105.) As bearing upon the question whether the New York Indians are to be regarded as the wards of the nation or of the state, we think there was no less reason for placing them under the protectorate of the Federal government than there was for extending it to the other tribes resident in any of the original thirteen colonies. The Federal government made treaties with them, as did the state. This has repeatedly recognized the authority of the general government over them, and the latter has acquiesced in the right of the state to deal with them. (Seneca Nation v. Christie, 126 N. Y. 122.) The Federal treaties contain guaranties which confirm their territorial possessions, although the Federal government never

owned the fee of the land within our state confines.   In Fellows
v. Blacksmith (19 How. U. S. 366; 371) the New York Indians
are referred to by the United States Supreme Court as wards
of the nation, and it was there held that they could not be re-
moved from their lands in this state by our courts, but that the
power resided solely in the Federal government.   So in Wor-
cester v. Georgia (6 Peters, 515) it was held that the state of
Georgia, one of the original thirteen colonies, could not enforce
an act for the punishment of persons intruding upon the
Cherokee reservation, where the provisions of the statute in
question conflicted with the treaty between the Cherokee nation
and the Federal government, and from the discussion in the
great opinion by Chief Justice MARSHALL, which took a very
wide range, it is evident that he regarded all the Indian tribes,
irrespective of their locality, as under the protection of the
United States government.   In the case of the New York
Indians (5 Wall. 761) the Federal Supreme Court held that
the treaties entered into between these Indians and the United
States, by which the possession of their lands was secured to
them, prevented the state from taxing such lands, and the
statute of our state authorizing such taxes was held void as " in
conflict with the tribal rights of the Seneca nation as
guaranteed to it by the treaties with the United States."   The
opinion in that case refers to the case of the Kansas Indians
(Id. 737) as stating the reasons underlying the court's decision,
and indicates quite plainly that there is no vital distinction be-
tween our Indians and those of the west.

The statute of 1885, by its terms, makes no distinction be-
tween Indians living upon reservations set apart for them on
government lands in the west and those in the eastern states
who still inhabit the country originally occupied by them.   So
long as they live in their tribal relations and are not so as-
similated with the general population as to change their

political status, the power of the general government, within the sphere of its exercise, is supreme over them. The statute confers upon the Federal courts jurisdiction of the enumerated crimes committed by an Indian " within the boundaries of any state of the United States, and within the limits of *any* Indian reservation." We are not at liberty to limit this broad language unless we can find somewhere in the statute or its history the indication of an intent that it should be limited, and we have found none. Congress has continued to act upon the theory that it has jurisdiction of our New York Indian tribes no less than of their brethren in the west. This was illustrated by the fact that the Dawes Act (of Feb. 8, 1887, 24 Stat. at Large, ch. 119, p. 388), under which was originated the present policy of enabling Indians to free themselves from their tribal relations by taking lands in severalty, expressly excepts the lands of the Senecas from its operation. The committee of five named by Governor Roosevelt to inquire into the political status of the New York state Indians reported: " Treaties with these tribes have been made by the National Government from as early a date as 1789 regarding removal from their lands and other subjects, the language of which would seem to imply that the General Government considered its relations to these tribes to be similar to that which has always existed with the tribes of the west." (U. S. House Documents, vol. 28, 1900; Reports of Department of Interior, Indian Affairs, No. 5, p. 652.)

In U. S. v. Sandoval (231 U. S. 28, 45), which was a prosecution for a violation of the statute prohibiting the introduction of liquor into the Indian country, the defense contended *inter alia* that the Pueblo Indians did not come within the spirit of the act, but it was held that they did. Justice VAN DEVANTER, writing for the Supreme Court, there said: " Not only does the Constitution expressly authorize Congress to

regulate commerce with the Indian tribes, but long continued legislative and executive usage and an unbroken current of judicial decisions have attributed to the United States, as a superior and civilized nation, the power and the duty of exercising a fostering care and protection over all dependent Indian communities within its borders, whether within its original territory or territory subsequently acquired, and whether within or without the limits of a state. As was said by this court in United States v. Kagama (118 U. S. 375, 384) : ' The power of the General Government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government, because it never has existed anywhere else, because the theatre of its exercise is within the geographical limits of the United States, because it has never been denied, and because it alone can enforce its laws on all the tribes.' " (See Apapas v. United States, opinion by Chief Justice WHITE, rendered May 11, 1914, and not yet reported.) In Fellow v. Blacksmith (60 U. S. 366) it was held that the Tonawanda Indians could be compelled to remove from their reservation only by the action of the United States.

Early in the history of this state our legislature passed a statute in which the preamble recited that the Senecas and other Indian tribes had assumed the authority to punish crimes committed by Indians on their respective reservations, and that it had become necessary to assert the jurisdiction of the state courts over the Indians as well as others. It was, therefore, enacted that the sole and exclusive jurisdiction to try and punish all persons, " of whatsoever nation or tribe," for crimes committed in any part of this state, " except only such crimes and offenses as are or may be cognizable in courts deriving jurisdiction under the constitution and laws of the United

States," is exclusively vested in the courts of the state. (L. 1822, ch. 204.) This statute was repealed and was succeeded by a provision in the Revised Statutes declaring that " The several courts of justice organized under the Constitution and laws of this state, possess the sole and exclusive jurisdiction of trying and punishing in the manner prescribed by law, all persons, *as well Indians as others*, for offenses and crimes committed within the boundaries of this state, excepting only such as are exclusively cognizable by the courts deriving their jurisdiction under the laws and constitution of the United States." (R. S. part 4, ch. 1, tit. 7, section 1.) This part of the Revised Statutes was expressly repealed by the adoption of the Criminal Codes, but by section 724 of the Penal Code (Now Penal L., section 39) it is provided that " this chapter does not affect * * * any provisions of the laws relating to * * * Indians, * * * except so far as any provisions therein are inconsistent with this chapter." It was early asserted that, under the provision of the statute of 1822, the courts of this state had exclusive jurisdiction of crimes committed by Indians upon their reservations (Jackson v. Goodell, 20 Johns. 188, 192; reversed in Court of Errors, Id. 693), but until now there has been no case, under any of the succeeding statutes, involving the question before us.

From this confusing history of Federal and state legislation and judicial decisions upon matters affecting the relations of our governments to the Indians, it will be seen that the question is not free from doubt, but there are a few considerations which incline us to the view that the Federal jurisdiction must prevail. The Indians, although native sons of our soil, are not citizens either of the nation or state. They are heralded as the wards of the nation, and in their collective or tribal capacity they have been relegated to the status of foreign nations with whom the Federal government has entered into

treaty relations. This anomaly has been accentuated by the state legislation and treaties which, from time to time and in various ways, have indicated the purpose of the state to subject the Indians within our borders to the control of our laws and the jurisdiction of our courts. The fact remains, however, that Congress has always asserted and exercised the right to legislate in all Indian affairs, and its power to do so has been upheld by the Supreme Court in a case involving the validity of the very . statute now under consideration. (U. S. v. Kagama, *supra*.) In that case it was held, not only that Congress was acting within its proper sphere in enacting the statute of 1885, but that the extension of the Federal jurisdiction to Indians upon state reservations was not an invasion of state rights. It is said that there is a difference between the Indians whose reservations are the direct gift of the Federal government and those whose reservations have been derived from the state or from other sources. We find no such distinction in. the statute, and we can think of none that logically differentiates one from the other. Even if we assume that, in the absence of Federal legislation, the state has the most ample power to legislate for the Indians within its borders, there seems to be no escape from the conclusion that when Congress does act the power of the state must yield to the paramount authority of the Federal government. (Loomis v. Lehigh Valley R. R. Co., 208 N. Y. 312.) The Congress has exercised its power in respect of the crimes enumerated in section 328 of the United States Criminal Code, and the crime for which the relator has been arrested and held is among those therein set forth. For these reasons we think that the jurisdiction of our state courts must give -way before the higher authority which this statute vests in the Federal courts.

The orders of the courts below should be reversed, and mat-

ter remitted to the Special Term for proceedings in conformity with this opinion.

WILLARD BARTLETT, Ch. J., COLLIN, CUDDEBACK, HOGAN and CARDOZO, JJ., concur; HISCOCK, J., not voting.

Ordered accordingly.