257 F.2d 885
 TUSCARORA NATION OF INDIANS, also known as Tuscarora Indian
Nation, Plaintiff-Appellant,
v.
POWER AUTHORITY OF the STATE OF NEW YORK, Robert Moses,
Defendants-Appellees-Corss Appellants, and
Superintendent of Public Works of the
State of New York, John W.
Johnson, Defendant-Appellee.
 No. 394, Docket 25236.
 United States Court of Appeals Second Circuit.
 Aruged July 10, 1958.
Decided July 24, 1958, Petition for Rehearing and for
Clarification Denied Aug. 26, 1958, Certiorari
Denied Oct. 13, 1958, See 79 S.Ct. 66.
 
 Arthur Lazarus, Jr., Washington, D.C. (Strasser, Spiegelberg, Fried & Frank, Daniel M. Singer, Washington, D.C., on the brief), for plaintiff-appellant.
 Thomas F. Moore, Jr., New York City (Samuel I. Rosenman, New York City, Henry S. Manley, Strykersville, John R. Davison, Albany, on the brief), for defendants-appellees-cross appellants, Power Authority of State of New York and Robert Moses.
 Julius L. Sackman, Associate Atty., Albany, N.Y. (Louis J. Lefkowitz, Atty. Gen., of the State of New York, Paxton Blair, Sol. Gen., Albany, N.Y., on the brief), for defendant-appellee, Superintendent of Public Works of State of New York, John W. Johnson.
 Before SWAN and MOORE, Circuit Judges, and ANDERSON, District Judge.
 MOORE, Circuit Judge.
 
 
 1
 The appellant Tuscarora Nation of Indians (referred to as 'Tuscarora') brought this action in the federal court under 28 U.S.C.A. 1331, 2201 and 2202: (1) for a declaratory judgment to the effect that the appellees, Power Authority of the State of New York, Robert Moses, and Superintendent of Public Works of the State of New York, John W. Johnson, have no power to acquire a portion of their lands without the express consent of the United States and (2) for a permanent injunction against the appropriation of their lands without their consent.
 
 
 2
 The suit was commenced on April 19, 1958 in the Southern District of New York, and was later transferred (161 F.Supp. 702) to the Western District, where it was heard on the merits. The decision of June 24, 164 F.Supp. 107, ordered (1) that the Power Authority's motion for a three judge court be denied; (2) that the temporary restraining order previously issued be dissolved; (3) that plaintiff's motion for a permanent injunction be denied; (4) that the complaint be dismissed without costs; and (5) that the affidavit of Henry S. Manley be stricken as an affidavit and be considered as an additional brief on behalf of the defendants. The appeal is taken pursuant to 28 U.S.C.A. 1291.
 
 
 3
 The Tuscarora are a tribe of American Indians occupying lands in western New York. They migrated to central New York State from North Carolina prior to the American Revolution and became a part of the Iroquois Confederacy, sometimes referred to as the Six Nations. Subsequent to the Revolution New York State desired to move the Oneidas and Tuscaroras from central New York to the territory of the Senecas in western New York. As a result of sales of the Indians' rights of occupation the main body of Tuscaroras moved to Niagara County where they acquired three tracts of property. The first tract, a mile square (640 acres), was a right of occupancy conceded to them by the Senecas. The second tract (1280 acres) was a gift from the Senecas and the Holland Land Company. The third and largest tract, and the only tract involved in this litigation, consists of 4329 acres. This third tract was acquired in 1804 (title finally taken in 1809) for the Tuscarora through the good offices of the Secretary of War of the United States. The Tuscarora purchased the fee to this tract from the Holland Land Company out of the proceeds received from the sale of their North Carolina properties. Since that time the Tuscarora have lived on these tracts as a tax-exempt Indian Reservation despite the fact that the third tract was acquired by purchase and not as a grant from the United States.
 
 
 4
 The Power Authority of the State of New York is in charge of the development of a power project in western New York known as the Niagara River Power Project. This project was authorized by Congress and made possible by a treaty with Canada (February 27, 1950), which greatly enlarged the amount of water from the Niagara River available to the United States for power purposes. Following the treaty Congress through Public Law 85-159 (Act of August 21, 1957, 71 Stat. 401, 16 U.S.C.A. 836, 836a) authorized and directed the Federal Power Commission to issue a license to the Power Authority for the construction and operation of a power project with capacity to utilize all of the United States' share of the water permitted to be diverted under the terms of the treaty. The license was issued on January 30, 1958. On March 28, 1958 the Power Authority filed a petition in the Supreme Court of the State of New York for Niagara County to condemn 1,383 acres of the Reservation lands of the Tuscarora Nation of Indians whose entire Reservation consisted of 6,249 acres. The portion sought to be condemned was planned to be used for a water storage reservoir in connection with the Niagara power project. On April 15, 1958 the Power Authority withdrew the condemnation proceedings in the Supreme Court of New York and by filing a map of the 1,383 acre portion of the Tuscarora Reservation pursuant to 30 of the New York State Highway Law, McKinney's Consol.Laws, c. 25, and Article 5, Title 1 of the Public Authorities Law, McKinney's Consol.Laws, c. 43-A, appropriated the 1,383 acres for the purpose of the reservoir. At the same time a sum estimated by the Power Authority to be the fair market value fo the appropriated land was, as required by Statute, deposited with the Comptroller of the State of New York. The provisions of 30 of the New York Highway Law authorize the Power Authority, after filing the map and depositing the money, immediately to enter upon and take possession of the property described.
 
 
 5
 A power plant has been planned which will be the largest hydro-electric project in the United States. The total cost is estimated at upwards of.$625,000,000 and contracts have already been authorized for more than $339,000,000. An essential part of the project is a large water storage reservoir of at least 600,000 acre feet. Construction work and power lines relocation are now at the very edge of the Tuscarora Reservation.
 
 
 6
 Although both parties have given the court the benefit of the historical development of title to Indian lands in New York State and the various treaties relating thereto, this background material affects largely tracts 1 and 2 which are not now before the court. Since tract 3 was acquired in fee by purchase the primary question is: What laws and treaties apply to, and what other obligations have been assumed by the United States and the State of New York with respect to, this particular Indian Reservation?
 
 
 7
 Appellant claims that the taking of a portion of its Reservation is in violation of Title 25 United States Code, Sections 177 and 233. Appellees, on the other hand, assert that these statutes do not apply to the State of New York which possesses sovereign power of condemnation over Indian lands, independent of and never surrendered to, the Federal Government, derived from its status as one of the original thirteen colonies.
 
 
 8
 Indian Non-Intercourse Acts: State and Federal
 
 
 9
 In order to prevent Indians from being victimized by artful scoundrels inclined to make a sharp bargain, both New York and the United States from an early date imposed restrictions on the acquisition of lands from the Indians by private persons unless adequate protection was afforded. Thus in 1777 the first Constitution of New York State provided that 'no purchases * * * shall be binding * * * or deemed valid, unless made under the authority and with the consent of the legislature of this State' (Article XXXVII). This provision, in substance, has been continued in subsequent constitutions, Const. art. 1, 13.
 
 
 10
 In 1790 the United States enacted its first Indian Non-Intercourse Act which imposed a similar restriction against sale 'unless the same shall be made and duly executed at some public treaty, held under the authority of the United States' (1 Stat. 138). A second Non-Intercourse Act was passed in 1793, 1 Stat. 329. Other acts embodying substantially the same restrictions were enacted but the statute remains in virtually the same form today. Thus 25 U.S.C.A. 177 provides:
 
 
 11
 'Purchases or grants of lands from Indians. No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution. Every person who, not being employed under the authority of the United States, attempts to negotiate such treaty or convention, directly or indirectly, or to treat with any such nation or tribe of Indians for the title or purchase of any lands by them held or claimed, is liable to a penalty of $1,000. The agent of any State who may be present at any treaty held with Indians under the authority of the United States, in the presence and with the approbation of the commissioner of the United States appointed to hold the same, may, however, propose to, and adjust with, the Indians the compensation to be made for their claim to lands within such State, which shall be extinguished by treaty.'
 
 Subsequent Laws and Decisions
 
 12
 As time passed the states were given more and more power to apply their laws in the Reservations of the Indians. Appellees refer to many cases, spread over a century and a half or more of dealings between the State of New York and the Indians within its boundaries, relative to Indian Reservations or tribal lands, reveal transfers in which parcels of land or interests therein, such as highways, easements for telephone lines and other takings short of the seizure of the whole or a substantial portion of such Reservations or tribal land, have been taken, granted or conveyed without special authorization by Congress and with the express, or at least tacit, acquiescence of the executive official of the United States chargeable with the responsibility for Indian affairs. A great majority of these cases have been in the State Courts of New York and two or three have been in the District Court of the United States. An examination of these cases discloses that between the earliest years of this Nation's existence and 1950, a large measure of social and economic intercourse relating to Indian tribal matters in the State of New York has been left to the State of New York through either the indifference or approval or express authorization of the federal executive officials who at a particular time had the responsibility for the care of the Indians. Despite this situation the Court of Appeals of New York has recognized that during all of this period, the Indians are and always have been, since the formation of this Government, the wards of the Nation and not of the States, and that the Federal Government has never relinquished its suzerainty over them.
 
 
 13
 In both criminal and civil fields Congress allowed the State laws to be extended onto the Reservations. However, in the act of September 13, 1950, 25 U.S.C.A. 233, granting to the courts of New York State jurisdiction in civil actions between Indians, there were specific exceptions, the first being that nothing therein contained shall be construed as subjecting the lands within Indian Reservations in the State of New York to taxation or subjecting them to execution on any judgment except a judgment by one tribal member against another as to use or possession of land; and second, 'That nothing herein contained shall be construed as authorizing the alienation from any Indian nation, tribe, or band of Indians of any lands within any Reservation in the State of New York; * * *.' This second exception was made the subject of comment in the Report of the Joint Legislative Committee on Indian Affairs to the Legislature of the State of New Yrok as follows:
 
 
 14
 'Neither would the proposed law permit taxation or alienation of reservation land, although many Indians have been led to believe that these are the very ends the bills aim to accomplish.
 
 
 15
 'Specific exclusion of the powers of taxation and disturbance of titles makes it clear that adoption of the bills would not end all Federal guardianship * * *.'
 
 The Power Authority's License
 
 16
 The Power Authority claims to have derived its authority from a license issued to it pursuant to Public Law 85-159, 71 Stat. 401 which authorized and directed the Federal Power Commission to issue a license to the Power Authority for the construction and operation of a power project to utilize all of the United States' share of the water of the Niagara River permitted to be used by International agreement. Such a license was issued to the Power Authority although vigorously opposed by the Tuscarora. The Commission, however, did not pass on the eminent domain question because it expressly declared 'The question of whether the Licensee is empowered to acquire Intervener's land in eminent domain proceedings is, in our view, a question to be resolved by a court of competent jurisdiction. In any event, we are of the view that we are not required to render an advisory opinion on that question.' A petition for review of the Commission's order is presently pending before the Court of Appeals for the District of Columbia.
 
 
 17
 Under 4(e) of the Federal Power Act, 16 U.S.C.A. 797, the Commission is authorized to issue licenses for the purpose of constructing reservoirs and power houses, etc., even 'upon any part of the public lands and reservations of the United States' except that such a license 'shall be issued within any reservation only after a finding by the commission that the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired, and shall be subject to and contain such conditions as the Secretary of the Department of Interior under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization for such reservations: * * *.'
 
 
 18
 The acquisition of property for the construction of reservoirs, etc., is implemented by 814 of the Federal Power Act which provides for the exercise by the licensee of the right of eminent domain. The section specifically provides for the manner in which this power may be exercised, namely, 'It may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such land or other property may be located, or in the State courts. * * *'
 
 
 19
 The United States Guardianship of Indian Rights
 
 
 20
 Over the last one hundred and fifty years there have been many court decisions relating to the rights of Indians. Although each case was decided on the facts which gave rise to the controversy, there has been uniform support for the doctrine that the Indian tribes are wards of the United States and that a general guardianship power is vested in the United States to protect them and their property. This philosophy on the part of the courts has been expressed in various ways.
 
 
 21
 In the New York Court of Appeals, People ex rel. Cusick v. Daly, 1914, 212 N.Y. 183, 105 N.E. 1048, 1049, the court, after referring to the Supreme Court, decision in the Kagama case (United States v. Kagama, 1886, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228), which stressed the fact that the Reservation had been set apart by the United States said: 'But these were not the controlling elements in the decision, as will be seen from a perusal of the whole opinion, for the power of the federal authorities was asserted primarily because the Indian tribes in this country were, and always had been since the formation of the government, the wards of the nation and not of the states.' This case dealt specifically with the Tuscarora Indians. The court traced their history from their North Carolina days to their final Reservation in Niagara County, saying: 'Interesting as these facts may be to the student of history, they have little bearing upon the question to be decided. The truth is that we are dealing with dual relations growing out of peculiar conditions. The state of New York has enacted laws conferring upon these Indian tribes certain powers to regulate their own affairs, and to protect their lands from invasion (see Indian Law, Consol.Laws, Ch. 26), but the federal government has never relinquished its suzerainty over them.' The court further held that there was 'no less reason for placing them (the New York Indians) under the protectorate of the federal government then there was for extending it to the other tribes resident in any of the original 13 colonies' (212 N.Y. at page 192, 105 N.E. at page 1050). The court continued 'Congress has continued to act upon the theory that it has jurisdiction of our New York Indian tribes no less than of their brethren in the west' (212 N.Y. at page 193, 105 N.E. at page 1051). The conclusion of the court was that 'From this confusing history of federal and state legislation and judicial decisions upon matters affecting the relations of our governments to the Indians, it will be seen that the question is not free from doubt, but there are a few considerations which incline us to the view that the federal jurisdiction must prevail' (212 N.Y. at page 196, 105 N.E. at page 1052).
 
 
 22
 The Cusick case was followed by Mulkins v. Snow, 232 N.Y. 47, 133 N.E. 123, in which the court said 'They (the Indians) are the wards of the nation, and Congress has full authority to legislate for them within their reservation. People ex rel. Cusick v. Daly, 212 N.Y. 183, 105 N.E. 1048. When the state of New York legislates in relation to their affairs, its action is subject to the paramount authority of the federal government' (232 N.Y. at page 51, 133 N.E. at page 124).
 
 
 23
 In the Supreme Court of the United States this guardianship has been frequently restated. It was described in the Kagama case, supra (118 U.S. 375, 6 S.Ct. 1114), as follows:
 
 
 24
 '* * * These Indian tribes are the wards of the nation. They are communities dependent on the United States,-- dependent largely for their daily food; dependent for their political rights. * * * From their very weakness and helplessness, so largely due to the course of dealing of the federal government with them, and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the executive and by congress, and by this court, whenever the question has arisen.'
 
 
 25
 In United States v. Candelaria, 271 U.S. 432, 439, 46 S.Ct. 561, 562, 70 L.Ed. 1023, the court said:
 
 
 26
 "Not only does the Constitution expressly authorize Congress to regulate commerce with the Indian tribes, but long-continued legislative and executive usage and an unbroken current of judicial decisions have attributed to the United States as a superior and civilized nation the power and the duty of exercising a fostering care and protection over all dependent Indian communities within its borders, whether within its original territory or territory subsequently acquired, and whether within or without the limits of state. * * * 'It is for that body (Congress), and not for the courts, to determine when the true interests of the Indian require his release from such condition of tutelage."'
 
 
 27
 Not only has Congress not abandoned the field with respect to the property interests of Indian tribes in the State of New York but it has, by the enactment of the express reservation concerning land interests of the Indian tribes in New York in Title 25 U.S.C.A. 233, pointed up and reaffirmed its paramount authority over Indian tribal lands.
 
 
 28
 The primary question now to be decided is whether sections 177 and 233 of Title 25 U.S.C.A. prohibit the taking of any portion of the lands of the Tuscarora or whether the general power of the sovereign, namely, the United States, to take the lands of any of its subjects for appropriate public purposes, provided just compensation is paid, is paramount and impliedly written into all statutes affecting property.
 
 
 29
 A secondary question is, assuming that power of eminent domain exists, has it been exercised by the proper authority and in the manner prescribed by law?
 
 
 30
 Were the lands in question owned by citizens other than Indians, there would be no question but that the power of eminent domain could be exercised for the purposes of the power project. To create an exception it must be found that the Indians occupy some special status which renders them immune from the application of this principle. For many years their Reservations have been specially protected by law. They have practiced their own tribal customs and enjoyed their own way of life without too much outside interference. The present appropriation calls for the destruction of approximately one-third of the entire Reservation embraced within tract number 3. Unless there is some over-riding need or equity in others, the situation would seem to call for the exercise of that guardianship protection which the United States has asserted and exerted over the years.
 
 
 31
 On the other hand, as years go by there has been conscious effort to assimilate the Indians into the communities in which they live and to extend to them the same equal protection of the laws as all other citizens enjoy. This view is well exemplified in the Senate Report which preceded the passage of the civil jurisdiction bill in 1950 in which it was said that:
 
 
 32
 'Your committee believes that all citizens of a State should be parts of one social order; that anything which conflicts with this principle should be brought into confromity therewith at the earliest time consistent with justice; that the civil relationship and responsibility of all citizens within a State should be equal as well as just and under the jurisdiction of a common code of laws that govern all and protect all alike.' Sen.Rep. No. 1836, June 15, 1950.
 
 
 33
 If the Indians are to enjoy equal protection of the laws and all the other benefits extended to each citizen it may well be that they should bear some of the burdens including that of being subjected to having their lands condemned for public purposes, beneficial to the State in which they live.
 
 
 34
 The sovereign power of the United States is exercised by Congress and it would be anomalous indeed if this very power which could make its own land subject to condemnation (16 U.S.C.A. 797) could not be extended to the land of those over whom it exercises its guardianship. This power has been asserted from time to time as, for example, in the Reclamation Acts, the appropriation of vast areas in the mid-west for irrigation and other public projects. In Henkel v. United States, 237 U.S. 43, 49, 50, 35 S.Ct. 536, 539, 59 L.Ed. 831, the Supreme Court said:
 
 
 35
 'The authority of the Congress of the United States to devote these lands to irrigation purposes is unquestioned. As a matter of fact, it might, if it saw fit, remove the Indians therefrom and devote the land to such uses. Recognizing the injustice of arbitrary appropriations to other uses, no effort has been made to take these lands without compensation to the Indians for the improvements which they have made, and they have been given the right to select other lands in place of those released. The reclamation projects undertaken by the government are very extensive and cover many states; and they must involve in their construction, the flooding of lands in connection with dams designed to hold water for such purposes; and must necessarily include much territory which is included in Indian reservations. This situation was of course well known to Congress when it passed the Reclamation Act, and we cannot doubt, in view of the broad authority conferred by sections 7 and 10, above quoted, that it was the purpose of Congress to give the Secretary of the Interior the right to acquire such rights as are here involved, when necessary for reclamation purposes. In carrying out the purposes of the act, the Secretary of the Interior is authorized to acquire any rights or property necessary for that purpose, and to acquire the same either by purchase or by condemnation. He is specifically authorized to perform any and all acts necessary and proper for the purpose of carrying into effect the provisions of the act. Authority could hardly have been conferred in more comprehensive terms, and we do not believe it was the intention of Congress, because of the Indians' right of selection of lands under the circumstances here shown, to reserve such lands from the operation of the act. To do so might defeat the reclamation projects which it was evidently the purpose of Congress to authorize and promote. * * *'
 
 
 36
 The power of condemnation was also recognized in the passage of section 409a Title 25 U.S.C.A. which provides that 'Whenever any nontaxable land of a restricted Indian of the Five Civilized Tribes or of any other Indian tribe is sold to any State, county, or municipality for public-improvement purposes, or is acquired, under existing law, by any State, county, or municipality by condemnation or other proceedings for such public purposes, * * *' the proceeds therefrom may with the approval of the Secretary of the Interior be reinvested in other lands selected by the Indians and shall become restricted as to alienation and taxability as the lands condemned.
 
 
 37
 The court below came to the conclusion that 'There is no constitutional requirement that the appropriation now involved be specifically authorized by an act of Congress' and that neither sections 177 nor 233 of Title 25 U.S.C.A. presented any bar to the exercise of eminent domain. The wording of these two statutes does not, in our opinion, lead to such a conclusion. However, the same result is reached because the right of eminent domain of the United States is superior to, and could not have been extinguished by, the statutes in question. Of necessity, however, the exercise of this power must be by the United States through Congress.
 
 
 38
 This power may be found in the direction given to the Federal Power Commission to issue a license to the Power Authority (71 Stat. 401) and the right granted to a licensee to use the right of eminent domain. Appellant challenges this approach by arguing (1) that the Federal Power Commission cannot thus usurp the authority of Congress and (2) that any taking of Tuscarora property must be by special enactment directed to Tuscarora land. General acts, the Tuscarora say, will not suffice.
 
 
 39
 There is no question that Congress has the constitutional authority to take Indian Reservation or tribal lands by eminent domain. Cherokee Nation v. Southern Kansas Ry. Co., 135 U.S. 641, 10 S.Ct. 965, 34 L.Ed. 295. There remain to be determined whether in delegating its power of condemnation to the Power Authority, Congress expressly or impliedly intended to authorize the taking of Indian Reservation or tribal lands (as distinct from lands allotted to Indians in severalty, 25 U.S.C.A. 357); and whether in the course of its condemnation procedure the Power Authority complied with the pertinent provisions of the Federal Power Act.
 
 
 40
 Congress did not expressly authorize the taking of the appellant's land for the Niagara Power Project. Can it be inferred from the nature of the project and its proximity to the Reservation or from the impracticability of constructing it without taking a portion of the Tuscarora Reservation that Congress intended to authorize such a taking? Western Union Telegraph Co. v. Pennsylvania Railroad Co., 195 U.S. 540, 25 S.Ct. 133, 49 L.Ed. 312; Spalding v. Chandler, 1895, 160 U.S. 394, 16 S.Ct. 360, 40 L.Ed. 469; Seneca Nation of Indians v. Brucker, U.S. District Court, District of Columbia, Civil No. 2202-57, dated March 24, 1958 (unreported), and cases cited therein. Such an inference may properly be drawn when consideration is give to the size and extent of the Niagara Power Project.
 
 
 41
 The electric plant will have a capacity of 2,190,000 kilowatts, the largest hydroelectric plant in the United States, and will produce annually some 13,000,000,000 kilowatt hours of energy. To accomplish this result a large storage reservoir is essential for the efficient use of the available water supply.
 
 
 42
 The legislative history of the Niagara River Hydroelectric Power Project, 85th Congress, First Session, 1957, Vol. 2, U.S. Congressional and Administrative News, page 1585 et seq., shows that in the hearing before both Houses of Congress, the redevelopment plan contemplated 'a pump-storage plant at the top of Niagara escarpment 0.8 mile east of Lewiston, where water would be pumped during the night hours to a reservoir with surface area of 850 acres * * *.' While this acreage is less than that now sought to be taken, it may be assumed that Congress had general knowledge of the terrain and the pertinent area and that appellant's Reservation was in the vicinity and likely to be taken in part for the purposes of the project.
 
 
 43
 The direction to the Federal Power Commission was specific, namely, 'to issue a license to the Power Authority of the State of New York for the construction and operation of a power project with capacity to utilize all of the United States share of the water of the Niagara Power permitted to be used by International agreement.' The licensee by virtue of section 814 becomes vested with the governmental power of eminent domain. The exercise of the right is thus the act of an agency of the sovereign. But just as the grant is given by Congress it should be exercised in the manner prescribed by Congress which is either in the district court where the property is located or in the state courts. The appellees, although they started their condemnation proceedings in the State court, chose to abandon that method and proceeded under New York Public Authorities Law (specifically passed in 1958) and the New York Condemnation Law, McKinney's Consol. Laws, c. 73 giving the Power Authority the right to proceed by appropriation under section 30 of the New York Highway Law. If Congress had intended this procedure to be followed, section 814 instead of providing 'in the State courts' would have to read 'or in such manner as may be prescribed by the legislature of the state in which the property is located.' The specific 1958 legislation dealing with the Niagara River project enables the Power Authority to move in, appropriate the land and remove the owner before he has had a chance to have a judicial hearing. If Congress wishes this to be the method of eviction it should at least so declare in specific terms.
 
 
 44
 The final question is, what relief should be granted? The construction workers are on the borders of the Reservation ready to install power lines and cover the land with fill for the reservoir dikes. Nevertheless, aggressive construction activity should not be sufficient to nullify the protective policy of the Government towards the Indians or the laws calculated to enforce that policy. The Congressional concern, exhibited as recently as 1950, to except the two elements most carefully guarded by the Government, namely, tax exemption and alienation, from transfer to the civil jurisdictional powers of the State of New York is ample evidence that 'guardianship' still exists. If the Indians are no longer to be the wards of the United States such a change should be by Congressional enactment and not by court decision.
 
 
 45
 The court below dismissed the complaint thus preventing any relief by way of declaration of rights. This portion of the judgment should be reversed. Since the complaint seeks a declaration of rights we hold that the Power Authority of the State of New York as a licensee of the Federal Power Commission directed to issue a license pursuant to Public Law 85-159 (Act of August 21, 1957, 71 Stat. 401) is authorized to exercise the right of eminent domain according to the procedures specified in section 814 of the Federal Power Act (16 U.S.C.A. 814).
 
 
 46
 Pending the final determination of this action or any proceeding seeking to acquire the property in question, appellees are stayed from entering upon or damaging lands within the Tuscarora Reservation except that appellees shall have the right to conduct, and continue with, such activities on said property as have been excluded from the stays heretofore entered as amended from time to time.
 
 
 47
 The proceedings taken to appropriate the property in question by the filing of maps, notices or other documents pursuant to the Highway Law and the Public Authorities Law of the State of New York are vacated and annulled.
 
 
 48
 The District Court, in the event that the Power Authority desires to exercise its right of eminent domain in that court, is requested to expedite all proceedings as much as possible.
 
 
 49
 Insofar as the judgment appealed from dismisses the complaint and denies a stay it is reversed.
 
 
 50
 Insofar as the decision below holds that the Power Authority has the right to exercise eminent domain it is affirmed.
 
 
 51
 The cross-appeal with reference to the affidavit of Henry S. Manley is affirmed. It is sufficient that the material therein contained be received within the limitations fixed by the court below.
 
 
 52
 The judgment should be modified in accordance with this opinion. No costs.
 
 
 53
 On Petition by Appellant for Rehearing; and Motion by Appellees for Clarification or Modification of the Stay Provisions of this court's Judgment of July 24, 1958.
 
 
 54
 PER CURIAM.
 
 
 55
 The petition for rehearing is denied, and it is ordered that the mandate shall be issued six days after the date hereof.
 
 
 56
 Upon issuance of the mandate, the stay granted in the opinion of this court 'pending final determination of this action' will cease. Consequently after issuance of the mandate the answer to each of the three questions raised in the motion for clarification is 'No.'
 
 
 57
 SWAN, Circuit Judge (dissenting).
 
 
 58
 I disagree with the majority opinion only in its holding that condemnation by appropriation pursuant to the state statutes is not permissible under 21 of the Federal Power Act and the license issued by the Commission. In my opinion the judgment should be affirmed. The reasons which have led me to this conclusion have not been persuasive to my brothers, and I refrain from stating them here in order to avoid delaying the decision of the court.