In the Matter of the Application of WILLIAM J. DARCH and Another for the Enforcement of an Attorney's Lien.

In the Matter of the Application of W. K. HARRISON, Special Agent in Charge of New York Indians, Department of the Interior, Office of Indian Affairs, to Compel the Surrender to Him of Moneys etc., in Possession of GEORGE W. WATSON and Others.

Supreme Court, Genesee County, June 5, 1933.

*George W. Watson* and *William J. Darch*, for themselves as petitioners.

*William H. Coon*, for himself as respondent.

*John J. Bennett, Jr., Attorney-General* [*James P. Cotter, Deputy Attorney-General*, of counsel], for the Tonawanda Nation of Indians.

*Richard H. Templeton* [*Harold B. Ehrlich, Deputy United States Attorney*, of counsel], for the petitioner, W. K. Harrison.

CHARLES B. WHEELER, Official Referee. The first of the above-entitled proceedings is to declare and enforce an alleged attorney's lien on certain funds now held by William J. Darch and by William H. Coon, the proceeds of certain royalties paid them for mining gypsum underlying lands of the Tonawanda Nation of Indians under circumstances stated later in this opinion.

The second proceeding is to compel the payment to the petitioner Harrison of said moneys so held by Darch and Coon. Motions were made at the Special Term of this court for the relief demanded in the respective petitions. As the disposition of the questions raised involves in each proceeding many of the same questions of fact and law, the Special Term of the court, by orders made, referred both proceedings to this referee, and they were heard and tried together. The disposition of these proceedings requires a rather lengthy statement of the facts.

The Tonawanda Nation or Tribe of Indians lives on a reservation of about 7,500 acres of land lying in the main within the county of Genesee in this State. The Federal government made a treaty for the removal of these and other Indians of the Seneca Nation to lands in the State of Wisconsin.

The treaty was never carried out, although the Indians had relinquished and conveyed away their Indian title to certain lands in western New York. In 1857, by treaty with the United States, the Tonawanda Nation was given the right to purchase for reservation purposes certain land to be paid for out of the sum of $256,000 held in trust for them by the United States government. The reservation lands were so purchased, and the lands so purchased were conveyed to the Secretary of the Interior of the United States to be held by him in trust for the permanent occupation and enjoyment of the Tonawanda Nation of Indians. Subsequently, pursuant to statute, the Secretary of the Interior conveyed said reservation lands to the Comptroller of the State of New York to be held by him for said nation on the same trust. The lands so conveyed have been and are now occupied and held by the Tonawanda Nation. Deposits of gypsum were discovered to underlie the reservation lands.

The Legislature of the State of New York, by chapter 679 of the Laws of 1892, as amended by chapter 329 of the Laws of 1902, passed what is now section 85 of the Indian Law relating to the Indians on the Tonawanda Reservation. This section provides:

" Sale of gypsum, sand and gravel. The attorney of such nation, for the benefit of such nation, may contract for the sale of any gypsum, or plaster stone upon the Tonawanda reservation,

on such terms as he may deem just, but for not less than one dollar a cord in the quarry for the first five hundred cords taken out each year, and fifty cents for each additional cord, which contract shall be in writing, to be performed within twenty years from the making thereof. He may also contract for the sale of sand, gravel and refuse stone at a rate of not less than one dollar per car for the same but this contract shall be ratified by the peacemakers of the said nation before it shall take effect. A person purchasing such gypsum, at the time of contracting, shall execute a bond, with sufficient sureties, approved by such attorney, conditioned for the faithful execution of such contract, and the payment of the purchase price of such gypsum or plaster stone. Upon executing such bond, such person may lawfully enter upon such reservation, at the place or places designated in such contract, whether upon the common lands, or upon the individual improvements of the members thereof, for the purpose of quarrying and removing such gypsum, sand, gravel or stone, doing no unnecessary damage or injury. Out of the moneys arising from such sale, the attorney shall pay to the persons entitled thereto, for any injury or damage necessarily done to individual improvements or property, by the quarrying or removal of such gypsum, sand, gravel or stone, which damages, in case of disagreement, shall be fixed by three commissioners appointed by the county court of Genesee county, upon the application of the party aggrieved, three days' notice of such application having been given to such attorney. The surplus moneys arising from such sale remaining in the hands of such attorney after the payment of such damages, shall be paid by him, for the benefit of such nation, to the Indian agent appointed by the United States government for the State of New York. Such money shall be added to the annuity granted by the United States to such nation, and distributed and paid over to such nation at the same time and in the same manner as such annuity. Such agent shall receive for his services in receiving, distributing and paying over such moneys, five per centum of the amount received by him from the attorney of such nation."

Pursuant to this section, the then district attorney for Genesee county, for and on behalf of the Tonawanda Nation, entered into a contract with one Sallie E. Nobles, by which she was given the right to mine gypsum under the reservation lands on payment of a royalty or price of one dollar per cord. This contract was to last for twenty years. This contract was assigned to the Universal Gypsum and Lime Company, which sank shafts and conducted operations for the mining of gypsum underlying the reservation.

In October, 1927, one Jessie Peters Parker, a member of the Tonawanda Nation or Tribe of Indians, and the owner by Indian allotment of a parcel of land on the reservation, petitioned the County Court of Genesee county pursuant to the provisions of section 85, above quoted, asking for the appointment of commissioners to ascertain her damage by reason of the mining of gypsum underlying the lands hired by her as an Indian allottee. Her proceeding was predicated upon the claim and theory that the gypsum taken from under the lands held by her as allottee was her personal property, and that she was entitled by way of damage to be paid for the gypsum so taken.

On the other hand, the nation contended the gypsum was not the individual property of the petitioner, the allottee, but belonged to the nation as such, and the allottee had suffered no damage by reason of the mining under her allotment. The case was tried before the Hon. NEWELL K. CONE, county judge of Genesee county, and on December 20, 1928, he rendered judgment dismissing the proceeding, holding the petitioner was not the owner in fee of any allotted land, that the gypsum belonged to the Indian nation as a whole, and that the petitioner had suffered no damage. From this order or judgment, the petitioner, Jessie Peters Parker, appealed to the Appellate Division of the Supreme Court. The appeal was duly heard, and the Appellate Division, by judgment or order dated November 6, 1929, affirmed the order or judgment of the County Court. An opinion of the Appellate Division was handed down by the court and is published under the title of *Matter of Parker* (227 App. Div. 107).

From the judgment or order of the Appellate Division a further appeal was taken by Mrs. Parker to the Court of Appeals, and there the order or judgment of the Appellate Division was affirmed without opinion (253 N. Y. 620).

Mr. Darch and Mr. Watson represented the Tonawanda Nation in all of the proceedings had in all the courts on the application of Mrs. Parker.

In addition to the special proceeding above described taken by Mrs. Parker, Alec Sundown and James Doxtator, in behalf of themselves and others similarly situated, began an action in the Supreme Court of this State against the Tonawanda Band of Seneca Indians, William J. Darch, William H. Coon and the Universal Gypsum and Lime Company as defendants, among other things asking in their prayer for relief that the lease or contract giving the right to mine gypsum be declared null and void, and that the individual defendants account for certain moneys received by them by reason of royalties paid under said lease.

The petitioners William J. Darch and George W. Watson appeared in said action for the Tonawanda Nation of Indians and interposed an answer to the plaintiff's complaint, and after so doing, moved this court at a Special Term thereof for a judgment on the pleadings. As a result of said motion the plaintiffs' complaint was dismissed.

It is for services rendered the Tonawanda Nation of Indians in the special proceeding and action above mentioned that the petitioners Darch and Watson moved the Special Term of this court for an order declaring and impressing an attorney's lien in their behalf on the moneys in the hands of Darch and of Coon, and why said lien should not be enforced according to law.

The Special Term of this court, after hearing counsel, made an order referring the matter to this referee, to hear and inquire into the merits of the application and to report to the court with his findings and opinion thereon. Later, W. K. Harrison, the United States Agent for the New York Indians, began his proceeding to compel the payment to him of the moneys in question.

The referee has accordingly heard the parties and on such hearing has taken such testimony and heard such evidence as the parties have seen fit to offer, touching the merits of the matter, which has been considered by him as well as the papers and affidavits submitted and read before the court at Special Term.

To fully understand the case presented needs a further recital of the facts and circumstances under which Mr. Darch and Mr. Watson were retained and appeared to represent the Tonawanda Nation of Indians.

After the special proceeding instituted by Mrs. Parker was begun, Darch and Watson were brought in contact with certain members of the Tonawanda Nation and members of its council. This led to what is claimed to have been a meeting of the council of the Tonawanda Nation composed of chiefs or sachems of the various clans of the nation.

This alleged council meeting was held on the 14th day of December, 1927, and at that meeting a resolution was passed to retain Darch and Watson as attorneys for said nation. It is claimed this meeting of the Indian council was irregular, and its proceedings illegal and void. This claim will be discussed later in this opinion.

However, as a result of the meeting a written contract was made and signed bearing date the 15th day of December, 1927. A copy of the agreement is attached to the petition. It recites the agreement with Sadie Nobles, assigned to the Universal Gypsum and Lime Company, and the proceeding brought by Mrs. Parker and

that it was necessary to defend the proceeding. It then proceeds to retain Darch and Watson to defend and contest the proceedings, and any and all other actions resulting therefrom. The parties then mutually agree that said Darch and Watson "may retain and receive for their services and expenses the sum of One Hundred thousand dollars, contingent, however, upon the determination of such litigation in favor of the Nation."

Darch and Watson were to make no charge for their services unless successful. It was further agreed said compensation for services was to be paid exclusively out of moneys received for the sale of gypsum, pursuant to the contract or lease of June 1, 1921, or any similar subsequent lease or agreement, and at such times as said moneys are paid over by the mining company or its successors or other lessees.

The petitioners in this proceeding ask a lien be declared in their behalf and impressed for the amount of the contract, and be enforced according to law.

The Tonawanda Nation of Indians has appeared by the Attorney-General of the State of New York and the United States government by the United States Attorney for this district, and oppose the granting of the application on several grounds, among them:

*First*, that the contract retaining the petitioners and fixing their compensation was unduly or illegally authorized by the council of the Tonawanda Nation.

*Second*, that it was never approved by the Secretary of the Interior of the United States or by the Indian Commissioner of the United States or by the authorities of the State of New York.

*Third*, that the contract employing the petitioners is unreasonable, excessive and unconscionable as to the amount to be paid.

*Fourth*, on other grounds which will be discussed later.

The affidavits and evidence show that William J. Darch, one of the petitioners, now has and holds in his possession the sum of $7,973.59, and that William H. Coon, who is made a party and appears in this proceeding, has in his possession and holds the sum of $11,864.08, making in all the sum of $19,837.67 representing the purchase price or royalties for gypsum mined by the Universal Gypsum and Lime Company with certain accumulation of interest, all said moneys having been duly deposited in banks and kept intact pending the outcome of these proceedings.

The moneys held by the petitioner Darch were paid to him, pursuant to the provisions of section 85 of the Indian Law, as district attorney of Genesee county.

The $11,837.67 paid to and held by William H. Coon, the affi-

davits disclose, were paid to him pursuant to the provisions of chapter 16 of the Laws of 1927 of the State of New York, reading: " Section 81. Attorney. The state board of charities shall appoint an attorney and counsellor of the supreme court for at least three years to be the attorney for the Tonawanda Nation of Indians."

Mr. Coons was so appointed on April 17, 1928.

*As to the lien asserted by the petitioners, Darch and Watson:*

Assuming the contract for their retainer and services to be perfectly legal and valid, the referee is of the opinion and holds as matter of law that Darch and Watson can only assert a lien on the $7,973.67 now in the hands of Mr. Darch. That if any right of attorney's lien exists it must be limited and confined to those specific funds and does not attach to the funds in Mr. Coon's hands, or to other property of the Tonawanda Nation.

Section 475 of the Judiciary Law of the State reads: "Attorney's lien in action or special proceeding. From the commencement of an action or special proceeding, or the service of an answer containing a counterclaim, the attorney who appears for a party has a lien upon his client's cause of action, claim or counterclaim, which attaches to a verdict, report, decision, judgment or final order in his client's favor, and the proceeds thereof in whosoever hands they may come; and the lien cannot be affected by any settlement between the parties before or after judgment or final order. The court upon the petition of the client or attorney may determine and enforce the lien."

This section does not materially change the law touching attorneys' liens.

Two classes of liens are recognized, *first*, a so-called " *retaining* " lien, and *second*, a so-called " *charging* " lien.

A " *retaining* " lien is one giving the attorney the right to retain all papers or moneys belonging to the client coming into the attorney's possession as security for the payment of the attorney's services. A " *charging* " lien attaches to a judgment recovered through the attorney's efforts. A charging lien still exists under the statutes and has been enlarged to the extent that it now attaches to a cause of action before judgment, and except thus changed is the same as it was under the common law. (*Matter of Heinsheimer*, 214 N. Y. 361.)

However, it is the law that an attorney retained to defend actions where the answer asserts no counterclaim has no lien which can attach to any judgment or the proceeds thereof. (*Ekelman* v. *Marano*, 251 N. Y. 173, citing *National Exhibition Co.* v. *Crane*, 167 id. 505; *Matter of Heinsheimer*, 214 id. 361.) (See, also, *Matter*

*of Beckett*, 112 Misc. 45, where it is held that where the attorney's services brought into existence no fund, but consisted in meeting an attack on title, the attorney had no charging lien at common law or under the statute.)

The answer interposed for the Tonawanda Nation in the proceedings instituted by Mrs. Parker in the County Court contained no counterclaim. In effect it simply asserted that the title to the gypsum under Mrs. Parker's allotted lands belonged to the nation and not to Mrs. Parker, and she had suffered no damage by the mining of the gypsum.

The County Court in deciding the proceeding so held, and the order or judgment entered simply dismissed the proceeding, thus leaving the nation in possession of the rights it had exercised and asserted under the mining contract.

In the second proceeding or action brought by Mrs. Parker and others against the Tonawanda Nation and others, the plaintiffs sought to have the State statute authorizing the contract or lease of the reservation lands declared unconstitutional and void, and to have Darch and Coon account for the moneys received by them as royalties. The answer took issue as to the allegations made, but contained no counterclaim. On motion, the complaint was dismissed on the pleadings. The moneys paid to Mr. William H. Coon and now held by him cannot be said to be subject to any " *retaining* " lien in favor of Darch and Watson. Such moneys are not in the possession of either Mr. Darch or Mr. Watson. Mr. Darch received the royalty money for mining gypsum up to the time Mr. Coon was appointed the attorney for the Tonawanda Nation by the Department of Charities of New York pursuant to the provisions of chapter 16 of the Laws of 1927.

After Mr. Coon's appointment as agent and attorney for the Tonawanda Nation, Darch ceased to act as such, and pursuant to section 85 of the Indian Law the mining company paid the royalty money to Coon as their attorney, and he still holds those funds. It is manifest to the referee that under the rule governing such case no lien can attach to the moneys in Mr. Coon's hands, and if any right to a lien exists it must be confined to the moneys held by Mr. Darch.

Whether a right to a lien attaches to even such moneys remains to be considered.

*As to the validity of the action taken of December 14, 1927, assuming to retain Mr. Darch and Mr. Watson to represent the Tonawanda Indian Nation in the proceedings instituted by Mrs. Parker:*

Whatever action was taken by the nation, is that taken by what is claimed to be a meeting of the Indian council on December 14,

1927. It is contended that this meeting was irregular for various reasons and that its action was and is not legally binding on the nation.

The Tonawanda Nation of Indians is governed by a council. Its powers are set forth in section 80 of the Indian Law of the State. It is composed of chiefs or sachems chosen according to old Indian customs and usages by the matrons of the several clans composing the body of the Indians.

On the trial of these proceedings it was contended by some witnesses that there were eighteen members in all of the council and by other witnesses but sixteen in number.

At the meeting of December 14, 1927, there were but five present. The contention is made that three of those present and participating in that meeting were not in fact properly appointed chiefs and had no right to act. On the other hand, it is contended that other of the chiefs who did not attend and participate in the meeting of December 14, 1927, were not properly entitled to act as members of the council for various reasons which reduced the number below sixteen. Nevertheless, some eighteen claimed the right to act and had acted as members of the council, and we think the court justified in assuming and treating them as *de facto* members of the council. We cannot, in this proceeding, well inquire into the validity of their election to the positions filled. In any event, but five chiefs assumed to act at the meeting of December fourteenth, and in that connection it is contended no binding official action could be taken except by a *majority* of the whole number and such number were not present, and that only a majority of the council constituted a quorum for the transaction of business. It is undoubtedly true that recognized writers on Indian affairs have asserted that only a majority of the council constitute a quorum, and such is undoubtedly the rule generally recognized in most Indian nations and tribes.

The petitioners, however, contend that so far as the Tonawanda Nation is concerned the general rule and custom have been changed and that *one-third* of the council now and for some time constitutes a quorum.

It does appear that at a meeting of the council held on July 11, 1911, at which eight members of the council were present, a resolution was passed that " *there should be at least one-third of the members of the said council present at any meeting which shall be legal by law of the nation.*"

Since that time it appears that many meetings were held where one-third in number was recognized as constituting a quorum although on occasions the validity of the rule was challenged. The one-third rule does not, however, appear to have ever been

ratified at any meeting or by any vote of the members of the nation or tribe, and it is perhaps a fair question whether the council itself had authority or right to fix the number which should constitute a quorum of its own body. It certainly would not if the rule governing corporate bodies is to govern. What shall constitute a quorum of a governing body is usually provided for by law adopted by the entire membership of the corporation.

We find nothing in the New York Indian Law conferring the power to change the general rule as to quorums.

Assuming, however, the rule as adopted at the meeting of July 11, 1911, to be valid, and that one-third of the council members constituted a legal quorum, nevertheless, we find very serious objections to the legality of the proceedings of the meeting of December 14, 1927, purporting to authorize the contract entered into with Mr. Darch and Mr. Watson. The petitioners attended that meeting, and were assured that a quorum was present and undoubtedly acted in good faith in accepting the statement.

Nevertheless, the evidence shows that at least only eight of the total number of the council were given any notice of the meeting called for December fourteenth. Of the eight so notified, only five attended and took action. The evidence is that the president of the council called at the homes of three other members of the council for the purpose of giving notice of the meeting, but such members were not at home at the time and the president contented himself with leaving word with some women of the house that a meeting was to be held, but there is no evidence that such notice was ever communicated to them. It does not appear that the object or purpose of the meeting was stated. They assert they never received notice and knew nothing of the meeting.

We, therefore, have this situation, that of a meeting of the Indian council without notice to its members save the five attending and three others who did not attend. Under such circumstances were the five attending authorized to take official action binding the nation?

If a governing body consisted of a board of directors or trustees of a corporation there would be no question but that they had no power to legally bind the corporation by their action. In such cases it is the uniform and unquestioned rule that notice to all directors or trustees is necessary, and without such notice business transacted at such a meeting is illegal and void. (10 Cyc. 784, and cases cited.)

This rule of law applies equally to meetings of members and stockholders of an incorporated company. (10 Cyc. 323, 324.)

An exception exists as to stated meetings, where the time of holding them is fixed by statute or by law. There directors or members are bound to take notice of the time for stated meetings.

The meeting of the Indian council held on December 14, 1927, was not a stated meeting, but a special one to take action on the matter of retaining counsel to defend the Parker proceeding.

It is true that the Tonawanda Nation is not an incorporated body, but the chiefs composing the council sustain toward the nation a position analogous to those of directors of a corporation, and we can see no good or sufficient reason why the same rule should not govern their proceedings as those of directors or trustees of an incorporated company.

All on whom the responsibility of governing and protecting the interests of the nation and of its members rest, had the right, as it was their duty, to attend and participate in council meetings, and this required proper notice of the meeting to be held. Especially would this seem to be true when a matter of such grave importance as in the instant case binding the nation to the payment of $100,000 was to be passed on.

Without observing these necessary steps, any action taken is open to attack and repudiation as done without legal authority. For the reasons stated, the referee is of the opinion that the resolution passed at the meeting of December 14, 1927, and the contract following with Mr. Darch and Mr. Watson, were illegal and void and the nation has the right to so insist.

*As to whether the contract with Mr. Darch and Mr. Watson is null and void because never approved by the United States Secretary of the Interior and Commissioner of Indian Affairs:*

It is so contended by counsel for the Indians represented by the Attorney-General of the State of New York, and by the United States District Attorney appearing for the government.

Section 81 of the Code Annotated of the Federal statute relating to Indians and known as section 2103 of the United States Revised Statutes (U. S. Code, tit. 25, § 81), provides: " No agreement shall be made by any person with any tribe of Indians, or individual Indians not citizens of the United States, for the payment or delivery of any money or other thing of value, in present or in prospective, or for the granting or procuring any privilege to him or any other person in consideration of services for said Indians relative to their lands, or to any claims growing out of or in reference to, annuities, instalments or other moneys, claims, demands, or thing, under laws or treaties with the United States, or official

acts of any officers thereof, or in any way connected with or due from the United States, unless such contract or agreement be executed and approved as follows:" Then follow certain subdivisions of the section stating how the agreement shall be executed.

The second of the subdivisions provides: " *Second.* It shall be executed before a judge of a court of record, and bear the approval of the Secretary of the Interior, and the Commissioner of Indian Affairs endorsed upon it."

The sixth subdivision of the act further provides: "All contracts or agreements made in violation of this section shall be null and void."

The contract in question was never approved by the Secretary of the Interior or by the Commissioner of Indian Affairs.

It would seem that Mr. Darch and Mr. Watson thought such an approval by the United States authorities necessary. The contract was executed before Mr. Justice BROWN of the Supreme Court of this State and forwarded with letter asking its approval to the Commissioner of Indian Affairs.

He acknowledged its receipt and declined its approval, saying in substance that by the Indian Law of the State of New York it was the duty of the district attorney of Genesee county to appear for and represent the Tonawanda Nation in the matter.

The petitioners then wrote to the Commissioner a second and long letter stating reasons why in their opinion the contract should be approved. To this second letter the Commissioner replied, and among other things, said: " In your letter you have set out in detail nine reasons why the contract should be approved. Without going into the merits of the various reasons you have given why the contract should be approved, it may be said that the question involved does not appear to be a Federal question and the contract is not one that required approval under Section 2103 of the Revised Statutes. The legal title to the land in the Tonawanda Reservation is now in the Comptroller of the State of New York in trust and in fee for the Tonawanda Indians, such title having been transferred to the Comptroller of the State by deed of the Interior Department dated February 4th, 1862. It appears, therefore, that the State is the guardian of the lands of the Tonawanda Indians and the State Legislature has passed laws for their government. It further appears that there have been cases in the State Courts in which the Courts held that the Indians are not restricted in their selection of attorneys. You refer to the case of *Seneca Nation* v. *Jimeson* (62 Misc. 91) which has not been overruled, criticised or reversed.

" In view of the fact that this case does not involve a Federal question and the Indian lands are held in trust for them by the State of New York, it is believed that your contract with the tribe is sufficient to enable you to proceed. If an approval is necessary, it needs must be taken up with the proper State Officials. The contract, therefore, is returned herewith."

The outcome was that the contract was in fact never approved by the Secretary of the Interior or by the Commissioner of Indian Affairs.

It should, however, be here noted that the Federal authorities have since changed their views and in these pending proceedings take the position that an approval of the contract is and was necessary to make it valid and binding.

The referee will briefly consider the question later on.

However, after the receipt of the letter quoted, the petitioners did take the matter up with the office of the Attorney-General of the State of New York and asked for his approval and correspondence followed. The Attorney-General, in answer to the application, took the position that there was nothing in the statutes of the State authorizing him to approve the contract and stated in substance that nothing which had passed between the petitioners and his office should be deemed as an approval by him. So it comes about that the contract in question never received the approval of either the Federal or State authorities.

The referee is of the opinion that the Federal statute quoted requires the approval of the Secretary of the Interior and of the Commissioner of Indian Affairs.

The language of the statute appears plain and explicit, declaring: " No agreement shall be made by any person with any tribe of Indians, or individual Indians not citizens of the United States, for the payment or delivery of any money or other thing of value, in present or in prospective, or for the granting or procuring any privilege to him, or any other person in consideration of services for said Indians relative to their lands   *   *   *."

The services rendered or to be rendered were clearly in reference to the lands. The fact that the technical fee of the reservation lands is in the Comptroller of the State of New York does not, in our opinion, change the situation. The Comptroller held the legal title in trust for the Tonawanda Nation and for their use, occupation and enjoyment. The reservation was purchased by funds belonging to the nation and held in trust for them by the United States government. The Parker proceeding related to their lands and to the right to the gypsum underlying the reserva-

tion. The Federal statute was clearly designed to guard the government's wards against unwise and improvident contracts for services by others, requiring its approval of such agreements.

Congress had full right and authority to pass and enforce the act. It has never surrendered to the State its control over Indian nations and tribes.

In the well-considered case of *People ex rel. Cusick* v. *Daly* (212 N. Y. 183) the Court of Appeals of this State has held that the Indians are wards of the nation, and that the United States government has never relinquished its control over them; and while the State may legislate touching them, when Congress has acted the State must yield to the paramount authority of the Federal government. (Citing *Loomis* v. *Lehigh Valley R. R. Co.*, 208 N. Y. 312; *Seneca Nation* v. *Christie*, 126 id. 122.)

In its opinion the court quotes from the opinion of the United States Supreme Court in the case of *United States* v. *Sandoval* (231 U. S. 28, 45), where it is said: " Not only does the Constitution expressly authorize Congress to regulate commerce with the Indian tribes, but long continued legislative and executive usage and an unbroken current of judicial decisions have attributed to the United States, as a superior and civilized nation, the power and the duty of exercising a fostering care and protection over all dependent Indian communities within its borders, whether within its original territory or territory subsequently acquired, and whether within or without the limits of a state. As was said by this Court in *United States* v. *Kagama*, 118 U. S. 375, 384: ' The power of the General Government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government, because it never has existed anywhere else, because the theatre of its exercise is within the geographical limits of the United States, because it has never been denied, and because it alone can enforce its laws on all the tribes.' "

The petitioners contend that inasmuch as they presented the contract to the Federal authorities for approval and that they had declined to approve or disapprove on the ground that it was a matter which concerned the State authorities alone, they are estopped at this time from insisting an approval was necessary. There is a certain appeal by the argument. On the other hand, the question of estoppel concerns the Tonawanda Nation rather than the Federal government. Can the Indian nation be estopped from claiming the contract void for want of approval?

It is to be presumed that the nation knew that the contract before becoming valid had to be approved by the Federal authorities.

Can the failure to obtain such approval be charged to the Indians? We think it cannot, and a failure to obtain it will not preclude the nation insisting the contract void for want of it. As bearing on the whole question, the referee calls attention to the case of *Greene* v. *Menominee Tribe* (233 U. S. 558).

In that case Greene sought to recover upon an alleged guaranty by the tribe for certain supplies furnished individual members of the tribe to enable them to carry on logging operations. By way of defense, reference was made to the provisions of section 2103 of the Revised Statutes (now U. S. Code, tit. 25, § 81). It was insisted that because the contract was made in the presence of and with the assent of an agent of the Federal Interior Department the provisions of section 2103 should not be held applicable. Chief Justice WHITE, speaking for the court, in his opinion said: " It cannot be held that the presence of the agent of the Interior Department authorized the doing of that which was expressly prohibited by law. In other words, that an unlawful contract became lawful because of the presence, at its making of a public officer whose obvious duty was to see to it that the law was not violated."

The referee is unable to reach any other conclusion than that the contract in question is null and void owing to the fact it never was approved by the Secretary of the Interior and the Commissioner of Indian Affairs.

*As to the right to recover on a quantum meruit:*

A suggestion is made that although the contract of retainer and employment is null and void, nevertheless the petitioners are entitled to recover and have an attorney's lien declared and enforced on the basis of a *quantum meruit.*

That the petitioners ably performed valuable services for the nation in the proceedings in question is unquestionably true. They are both lawyers of ability and standing in their profession. They rendered valuable services to the Indian nation. The record shows they devoted much time to the case. The nation has received the benefit of their services and efforts, and it is the natural inclination of the referee, if possible, to see that they are fairly remunerated for what they have done.

Nevertheless, the referee is unable to discover how he may award anything on the basis of a *quantum meruit.*

If the Tonawanda Nation of Indians were a natural person such a thing might be done. But the nation and its members sustain the relation of *wards* of the United States, akin to minors incapable

of making valid contracts and agreements except in the manner prescribed by law. Enabling statutes have been passed by Congress and the State Legislature authorizing and permitting the making of certain contracts under certain conditions. Such is the act of the New York State Legislature authorizing the making of a contract for mining gypsum. Such legislation has been deemed necessary to meet certain situations, and the inference is clear that without such legislative acts the nation or Indians as wards had no authority or power to act as provided. It is held that an Indian tribe or nation has no capacity to sue in the courts without legislative authority. (*Johnson* v. *Long Island R. R. Co.*, 162 N. Y. 462.) Nor can it be sued. (22 Cyc. 120, 121.)

To make the nation liable for services rendered under a contract expressly forbidden and declare such contract null and void upon the theory of a *quantum meruit* for such services would, we think, amount to an evasion of the statute and of its purposes.

In the eyes of the law Indians still remain wards and infants under the protection of the Federal and State governments. As such they cannot legally appoint an agent or give a power, warrant or power of attorney and as regards infants such acts are deemed absolutely void. (22 Cyc. 514.)

It is possible that Congress may grant relief by appropriate legislation authorizing the United States Court of Claims to hear and pass on petitioners' compensation.

Taking the views which we entertain on the main questions involved, we deem it unnecessary to pass on other questions raised and argued by counsel.

*As to the right of the petitioner Harrison, as United States agent for the New York Indians, to have the moneys now held by Darch and Coon paid over to him as asked in the second of the above-entitled proceedings:*

By the original section 85 of the Indian Law the proceeds of mining gypsum on the Indian reservation " shall be paid by him [*i. e.*, the district attorney] for the benefit of such nation, to the Indian agent appointed by the United States government for the State of New York. Such money shall be added to the annuity granted by the United States to such nation, and distributed and paid over to such nation at the same time and in the same manner as such annuity."

However, by chapter 16 of the Laws of 1927 an act was passed to amend the Indian Law to conform to the State Departments Law in relation to Indian affairs.

The only change made is that instead of the district attorney of

Genesee county acting as attorney for the Tonawanda Nation the State Board of Charities shall appoint an attorney for the Indians who shall perform the same duties imposed on the district attorney before the amendment was made.

Pursuant to this amendment, Mr. Coon was appointed by the Board of Charities of the State for the Tonawanda Indians and is now acting as such and by virtue of such appointment he has received and now holds $12,115.84 in amount of the gypsum royalty money.

An examination of the amending act of 1927 shows no amendment was made to section 85 of the Indian Law.

We think that the amendment to section 85 simply provided for the substitution of the attorney appointed by the Department of Charities for the district attorney of Genesee county, and that with that change Mr. Coon is to continue to act for the Tonawanda Nation with the same powers and duties as the district attorney had. If this view is correct, then Mr. Coon is obligated to pay the moneys held by him to the United States Agent for the New York Indians for the benefit of the Tonawanda Nation, and Mr. Darch in turn should likewise account and pay over to such Indian Agent the moneys held by him as the proceeds of the sale of gypsum.

The referee entertains doubts as to the procedure taken by Mr. Harrison as United States Indian Agent, as to whether upon petition such as presented the court may order the payment over of moneys.

Nevertheless, no objection has been raised by any party to these proceedings to such procedure, and the second proceeding has progressed as though practically consolidated with the first. It seems to the referee that Mr. Harrison, the petitioner in the second proceeding, was a proper, if not a necessary party to the first.

As a conclusion of the whole matter, we find and report that the petition of Mr. Darch and Mr. Watson for a lien should be dismissed; that in the second proceeding the petition of Mr. Harrison should be granted.