## UNITED STATES v. NATIONAL GYPSUM CO. et al.

### Civil Action No. 156.

District Court, W. D. New York.

Dec. 28, 1942.

See, also, 42 F.Supp. 752.

George L. Grobe, U. S. Atty., of Buffalo, N. Y., and Aubrey Lawrence and C. C. Daniels, Sp. Assts. to Atty. Gen., for plaintiff.

Elmer E. Finck, of Buffalo, N. Y., for defendant National Gypsum Co.

John J. Bennett, Jr., Atty. Gen., for defendant People of State of New York.

KNIGHT, District Judge.

### Issue

This suit has been brought by the United States of America to have declared null and void Section 85 of the Act of the Legislature of the State of New York, approved February 17, 1909, and entitled "An Act in relation to Indians, constituting chapter twenty-six of the consolidated laws"; to declare null and void two leases, purporting to have been given for the mining of gypsum on the Tonawanda Reservation of Indians, in New York State.

Issue has been joined by the service of the Answers of the defendants. The plaintiff now moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, and for an accounting, and the defendants move for like judgment, and a dismissal of the complaint.

A question of jurisdiction in the United States to bring this suit is raised. This is not answered at the outset of this opinion, because it is answered by the decision on the motions hereinafter considered.

No material question of fact is presented. The only question of law is whether the State of New York could legally authorize the execution of the aforesaid leases for the mining of gypsum upon the Tonawanda Reservation.

Considerable time has elapsed since the plaintiff's original motion was made. There are sufficient reasons to justify a delay in a decision.

### Facts

The so-called Tonawanda Tribe of Indians was at one time a part of the Seneca Nation of Indians, one of the Six Nations constituting the Iroquois Confederacy. A detailed history of the relation of this Confederacy and the tribes constituting it has been the subject of many opinions of the courts. Prior to 1857 the Tonawanda Tribe became a separate and distinct tribe and maintained its tribal affairs and property separate and distinct from any other tribe of Indians. The Six Nations entered into certain treaties with the United States whereby the rights of the members of the separate Nations as to the lands and reservations were recognized and guaranteed to them by the United States. The Treaty entered into under date of November 11, 1794, 7 Stat. 44, stated that the United States acknowledged that the lands within the boundaries therein described were the property of the Seneca Nation and that it should "remain theirs, until they chose to sell the same to the people of the United States, who have the right to purchase." The lands constituting the so-called Tonawanda Reservation occupied by the Tonawanda Tribe of Indians, and including the lands as to which the leases aforesaid were executed, were within the lands described in that Treaty.

On or about January 15, 1838, the United States and the said Six Nations entered into a treaty which was ratified by the Senate of the United States on June 11, 1838, 7 Stat. 550. By this treaty the said Six Nations relinquished all claims to certain lands in Wisconsin which were to be acquired in exchange for certain lands in what is now the State of Kansas. Thereafter, pursuant to said treaty and the laws of the United States, the Seneca Nation agreed to convey to certain individuals certain lands in the State of New York, including among others, the Tonawanda Reservation occupied and belonging to the Tonawanda Tribe of Indians. Thereafter, the purchasers released to the Seneca Nation of Indians lands comprising the Allegany and Cattaraugus Reservations, and the Seneca Nation released to said purchasers lands comprising the Tonawanda Reservation and other lands. The Tonawanda Tribe of Indians refused to remove from its Reservation to the lands intended to be given to them for their occupancy and possession in what is now the State of Kansas. Because of such refusal, on or about November 5, 1857, 11 Stat. 735, another treaty was made between the United States and the Tonawanda Tribe of Indians, and subsequently ratified by the Senate of the United States, by the terms of which, in consideration of $256,000, the Tonawanda Tribe of Indians relinquished any claim to the lands set aside and reserved for their use in the State of Kansas and it was authorized to purchase of the individuals to whom the Tonawanda Reservation had been sold the lands of such reservation and to pay therefor at the rate of $20.00 per acre, such purchase

price to be paid from the aforesaid $256,000 obtained from the rights of the Tonawanda Indians in the Kansas lands. The treaty of November 5, 1857, and the subsequent treaty of June 4, 1858, also provided that the lands thus purchased by the Tonawanda Tribe of Indians should "be taken by deed of conveyance to the Secretary of the Interior of the United States * * * in fee, to be held by him in trust for the said Tonawanda band of Indians and their exclusive use * * * until the legislature of the State of New York shall pass an act designating some persons, or public officer of that State, to take and hold said land upon a similar trust for said Indians; whereupon they shall be granted by the said Secretary to such persons or public officer." Art. 3. The title to the lands so purchased was taken in the name of the Secretary of the Interior who held title thereto in trust until February 14, 1862, on which date the lands were conveyed by deed to the Comptroller of the State of New York "in trust" for the said Tonawanda Indians. On April 16, 1860, the State of New York, through its legislature, had ratified and confirmed the treaty of November 5, 1857, and the subsequent treaty of June 4, 1858, and in the act of confirming said treaties also provided that: "The title to said lands which shall be conveyed to the comptroller by virtue of this act, shall be held by him and his successors in office, in trust for the said Tonawanda band of Indians who shall, by virtue thereof, have and hold the exclusive use, occupation and enjoyment of the said lands; * * *." Laws N.Y.1860, c. 439, § 2.

By virtue of the Treaty of 1857 the Tonawandas acquired 7,449 acres of land released to Ogden and Fellows under the Treaty of 1838 between the United States and various tribes of New York Indians.

The total coverage of the tract in suit, according to one of the leases, is 1,280 acres.

There have been and there are now valuable deposits of mineral otherwise known as gypsum or plaster rock under the lands in said reservation, and the defendant, National Gypsum Company, for a number of years last past has been mining and removing such deposit of gypsum therefrom under the terms and conditions of the aforesaid leases.

Section 85 of the Indian Law of the State of New York, approved February 17, 1909, provides that: "The attorney of such nation [Tonawanda Nation], for the benefit of such nation, may contract for the sale of any gypsum, or plaster stone upon the Tonawanda reservation, on such terms as he may deem just, * * * which contract shall be in writing, to be performed within twenty years from the making thereof." It purports to require no ratification by the Peacemakers of the Nation, but the same section specifically provides for such ratification in case of the sale of "sand, gravel and refuse stone." This statute has remained substantially the same since the adoption of Chapter 394 of the Laws of 1873, save that the contract period has been extended from three to twenty years and save that by Section 81 of the Indian Law, enacted February 3, 1927, being Chapter 16, section 2, the State Board of Charities was authorized to appoint an attorney for the Tonawanda Nation of Indians.

On or about June 1, 1921, James Kelly, district attorney for the County of Genesee, designated as attorney for the Tonawanda Tribe by virtue of Section 81 of the New York Indian Law, purporting to act under authority of Section 85, supra, executed and delivered an instrument to one Sadie E. Nobles, purporting to grant the right to prospect and explore for gypsum on a portion of the Reservation, and granting an option to mine for a period of twenty years, on the terms and conditions therein set forth. Nobles, on or about April 26, 1922, served written notice exercising such mining option. Thereafter, on or about December 4, 1922, the aforesaid lease was modified to the extent of regulating the weighing of the gypsum. The aforesaid lease, by its terms, would have expired on April 26, 1942, or twenty years from the date of the determination to exercise the aforesaid option. On or about June 21, 1936, William H. Coon, as attorney for the Tonawanda Tribe of Indians, by virtue of his appointment pursuant to Section 81 of the New York Indian Law, as amended by Chapter 16, Section 2 of the Laws of 1927, executed and delivered to the National Gypsum Company an instrument purporting to grant the right to mine, quarry, crush and remove the gypsum or plaster rock from under the lands of the Tonawanda Reservation, being the same land described in the instrument executed and delivered to said Nobles, said instrument to be in force for a period of fourteen years, two months, and twenty days, dating from May 1, 1942. On or about July 1, 1923, said Nobles executed and delivered to the American Gypsum

Company an instrument purporting to be an assignment of all of her rights to the lease aforesaid. The National Gypsum Company is a successor in interest to the Universal Gypsum Company with which the American Gypsum Company was merged.

So far as is material here, except as hereinbefore stated, the aforesaid instrument executed and delivered to the National Gypsum Company by said Coon is substantially the same as that executed by James L. Kelly, attorney aforesaid, to said Nobles.

### Statement

■ For more than a century it has been recognized by the federal courts that the Indian tribes are under the control and protection of the United States; that the relation of the two corresponds to that of wards and guardians. Cherokee Nation v. Georgia, 30 U.S. 1, 5 Pet. 1, 8 L.Ed. 25; Worcester v. State of Georgia, 31 U.S. 515, 6 Pet. 515, 8 L.Ed. 483; Kansas Indians, 72 U.S. 737, 5 Wall. 737, 18 L.Ed. 667; Fellows v. Blacksmith, 60 U.S. 306, 19 How. 366, 15 L.Ed. 684; United States v. Kagama, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228; Heckman v. United States, 224 U.S. 413, 32 S.Ct. 424, 56 L.Ed. 820; United States v. City of Salamanca (opinion by this Court) 27 F.Supp. 541. This statement also finds support in cases in the highest courts of New York State. Patterson v. Seneca · Nation, 245 N.Y. 433, 157 N.E. 734; People ex rel. Cusick v. Daly, 212 N.Y. 183, 105 N.E. 1048, Ann.Cas. 1915D, 367; Mulkins v. Snow, 232 N.Y. 47, 133 N.E. 123; Seneca Nation of Indians v. Christie, 126 N.Y. 122, 27 N.E. 275.

■ It is also recognized as a corrollary to this proposition that to some extent the state may enact laws regulating the conduct of Indians living on the reservations within this state. This state control, however, is by sufferance only, the United States never relinquishing its sovereignty. State laws do not apply except so far as the United States has given its consent. United States v. Forness, 2 Cir., 125 F.2d 928, and cases there cited; United States v. Charles, D.C. 23 F.Supp. 346.

The situation with respect to the Tonawanda Reservation of Indians is unique as hereinbefore appears. So far as the court is informed there is no other which presents a like relation between an Indian tribe, a state and the United States. While the defendants make some point of the holding in Jemison v. Bell Telephone Co.,

186 N.Y. 493, 79 N.E. 728, 730, that the State of New York "exercises the exclusive sovereignty and jurisdiction over the Seneca Nation of Indians", upon the theory that none of the Seneca Nation come within the definition of "Indian Country" as claimed to be defined by the federal statutes, defendants' main contention is both that, through the adoption of the treaty with the Tonawanda Tribe and the acts aforesaid done pursuant to it, the federal government has relinquished its control over the Tonawanda Tribe, and also, if such control could be effected by statute irrespective of such treaty and acts pursuant to it, there was and is no federal statute giving control to the federal government.

■ The first question is as to the effect of the treaty, and the acts aforesaid taken in conformity with it. The treaty and the conveyance to the State of New York pursuant to it purport to transfer title "in fee, to be held * * * in trust for the said Tonawanda band of Indians and their exclusive use, occupation and enjoyment." It seems clear that the conveyance was "in trust" only and that the additional words "in fee" do not mean title "in fee simple", though the two terms "in ·fee" and "in fee simple" are often used synonymously. The term "in fee" gives no greater interest than an interest "in trust." It is clear from the whole proceedings that the Tribe did not intend to convey its title to these lands, nor, as I understand, do the defendants so claim. The state procured only a title "in trust" for the purposes stated.

■■ It will also be noted in this connection that the New York State Act authorizing acceptance of the deed makes no mention of a holding "in fee", but states that the title shall be held by the Comptroller, his successors "in trust."

This trust is a "dry" or "passive trust." Uses and trusts as existent prior to the revision of the statutes of New York in 1830 were abolished by that revision, except as to active express trusts. Townshend v. Frommer, 125 N.Y. 446, 26 N.E. 805. The Tonawanda Tribe concededly has the right to the actual possession and use of the premises, and under such a trust no title vests in the trustee. Wainwright v. Low, 132 N.Y. 313, 30 N.E. 747; Post v. Hover, 30 Barb. 312, affirmed 33 N.Y. 593. There are, of course, many authorities to this effect. Such a trustee is merely a

holding trustee, and that is exactly what the Tribe sought to secure through the Treaty and the deeds. The purpose was to put the title in trust in New York State in order that the experience it had had, as hereinbefore set forth, could not be repeated. Under this trust there was no right to convey any real estate. The gypsum in the mines is a part of the real estate, and the State as trustee had no authority to deplete the real estate by permitting the removal of the gypsum. The making of these leases purports to create an interest in land.

■ Each lease contains general provisions for surface rights incident to the mining. If we assume that the state had authority to grant these leases in default of federal action forbidding, we find that the federal statutes have fixed the terms and conditions on which mining leases can be granted and obviously these have not been met. Where Congress has passed an Act to cover a given situation, it supersedes state law providing for this same situation. United States v. Kagama, 118 U. S. 375, 6 S.Ct. 1109, 30 L.Ed. 228; Cusick v. Daly, supra.

Section 177, Title 25 U.S.C.A., R.S. 2116, provides, in part: "No purchase, grant, lease, or other conveyance of lands, * * * from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution." The substance of this section was derived from Section 12 of the Act approved March 30, 1802, 2 Stat. 139. The Act of 1802 was re-enacted with slight changes as Section 12 of the Act of 1834, 4 Stat. 730, R.S. Sec. 2116, 25 U.S.C.A. § 177, which has continued in the language quoted. Treaties between any Indian nation or tribe and the federal government were abolished by the Act of 1871, Chap. 120, 16 Stat. 544 (Section 177, Title 25 U.S.C.A.), but Section 177 still providing for purchase etc., through "treaty or convention" was included in the revision of the statutes of 1878.

If, as urged by the defendant this section is of no effect here because no treaty or convention can be entered into, the section would have no effect anywhere because no lease of land could be entered into by or through any tribe anywhere.

■ "This statutory provision [Section 177] is very general and comprehensive. Its operation does not depend upon the nature or extent of the title to the land which the tribe or nation may hold. Whether such title be a fee simple, or a right of occupancy merely, it is not material; in either case the statute applies." 18 Op. Atty. Gen. 237. Vide also 18 Op. Atty. Gen. 235 et seq.

■ It is believed that Section 177, supra, is applicable to the Tonawanda Tribe. The origin of the section is found in the so-called Indian Intercourse Acts of 1802 and 1834. The Act of 1834 was entitled "An Act to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers." Section 1 of the Act limited its application to what was termed by the Act "Indian Country." Section 1, however, was not included in the provision of the statutes in 1878. It nowhere appears in the U. S. Code. Section 1 as it now reads is included in Chapter 5, Title 25 U.S.C.A., entitled "Protection of Indians" in the United States. It is the claim of the defendants that the Tonawanda Tribe does not come within the provisions of Section 177, supra, because it is not a part of the "Indian Country." This claim is based principally upon the decision in Bates v. Clark, 95 U.S. 204, 24 L. Ed. 471, and Benson v. United States, C. C., 44 F. 178, in which latter case the court seems to approve the decision in Bates v. Clark, supra, as respects the definition of "Indian Country." Bates v. Clark, supra, was decided before the statutory revision in 1878. In United States v. Leathers, 26 Fed.Cas.No.15,581 p. 897, 899, it was said: "The case of Bates v. Clark, 95 U.S. 204 [24 L.Ed. 471], arose before the adoption of the Revised Statutes, and before December 1, 1873, while section 1 of the act of 1834 was in force, and can not be regarded as recognizing the definition of Indian country in that statute as still a part of our law." The reason for the omission of Section 1 in the Revised Statutes is clearly stated as follows in the last-above mentioned case: "What led to the omission of section 1 of the act of 1834 from the Revised Statutes was no doubt the consideration that it was no longer applicable to the present state of things,— was, in fact, obsolete. From the earliest period of our history the boundaries of the Indian country have been narrowing. * * * The policy has been to separate the Indian tribes from the rest of the people, and to set apart for their exclusive

use specific portions of the public domain. The statutes cited show that 'Indian country' is the term used generally to describe country in the occupation of the Indians, to which their title or right of occupancy— a right always hitherto recognized by the United States—has not been extinguished. * * * It follows that unless these various Indian reservations are Indian country, and if we are still bound by the definition in the act of 1834, there is little or no country to which the various sections of the Revised Statutes for the government of the Indian country can apply. But if we regard section 1 of the act of 1834 as repealed, and these portions of the public lands allotted to the use and occupation of the Indians as Indian country, the sections of the Revised Statutes in which those words occur will have such operation as to carry out what I think congress intended should be accomplished by their adoption."

In Ex parte Crow Dog, 109 U.S. 556, 3 S.Ct. 396, 399, 27 L.Ed. 1030, we find this statement with reference to the Act of 1834: "Since the passage of that act great changes have taken place by the acquisition of new territory, by the creation of new states, * * * and the Revised Statutes, while retaining the substance of many important provisions of the act of 1834, with amendments and additions since made regulating intercourse with the Indian tribes, has, nevertheless, omitted all definition of what now must be taken to be 'the Indian country.' "

As pointed out, treaties with the Indians have been abolished. However, the same results are accomplished by congressional action. The defendant, National Gypsum Company, asserts that it could hereafter obtain no lease, provided the state is without authority. It is believed there is no support for this view. With the approval of the federal government, through congressional action, and with the approval of the Council of the Tonawanda Tribe or its governing body, a valid lease could be made.

The question of the authority of the State of New York over the Indians upon the reservations within its confines has been considered in numerous cases by the courts of that state. Certain of these relate specifically to the Tonawanda Tribe. Some of these decisions are in conflict with the view herein taken, but there also seems to be a conflict between these. In Jemison v. Bell Telephone Co., 186 N.Y. 493, 79 N.E.

728, 730, the court said that the "state of New York exercises the exclusive * * * jurisdiction over the Seneca Nation of Indians." Of course, if that were true with respect to the Senecas, it were so with respect to the Tonawanda Tribe of the Senecas. This decision is certainly contrary to many decisions of the federal courts, including those hereinbefore cited, and also in conflict with People ex rel. Cusick v. Daly, 212 N.Y. 183, 105 N.E. 1048, Ann.Cas. 1915D, 367; Mulkins v. Snow, supra; and Paterson v. Seneca Nation, 245 N.Y. 433, 157 N.E. 734. Judge Pound, one of New York's eminent Judges, in the Mulkins case, supra [232 N.Y. 47, 133 N.E. 124], said: "When the state of New York legislates in relation to their [Seneca's] affairs, its action is subject to the paramount authority of the federal government." The defendants cite Matter of Parker, 227 App.Div. 107, 237 N.Y.S. 134, affirmed 253 N.Y. 620, 171 N.E. 808. This, like Hatch v. Luckman, 64 Misc. 508, 118 N.Y.S. 689, affirmed 155 App.Div. 765, 118 N.Y.S. 689, 140 N.Y.S. 1123, involved no question of the authority of the federal government, and what was therein said with respect to such authority is obiter. Further, the same Judge who wrote the opinion in Hatch v. Luckman, supra, wrote the opinion in Matter of Darch, 147 Misc. 836, 265 N.Y.S. 86, 101, in which he held that Section 81, Title 25 U.S.C.A. was a valid exercise of authority over the Tonawanda Tribe. He there held that a contract made with the Indian Council for the performance of services in connection with the sale of gypsum from these mines was void, because not made in conformity with Section 81, supra, and said: "The federal statute [Section 81] was clearly designed to guard the government's wards against unwise and improvident contracts for services by others, requiring its approval of such agreements. Congress had full right and authority to pass and enforce the act. It [Congress] has never surrendered to the state its control over Indian nations and tribes." There, as noted, the contract was approved by the Council and yet the court held the contract void. The contract there in question was concerned with the services performed in Matter of Parker, 227 App.Div. 107, 237 N.Y.S. 134, supra. Further, the Parker case quotes with approval from the opinion in Reservation Gas Co. v. Snyder, 88 Misc. 209, 150 N.Y.S. 216, 219, wherein we find this statement: "That, even though the

customary title by occupancy vests in the individual Indian for agricultural purposes, Congress refuses to recognize the right of the individual to acquire oil and gas rights by such occupancy, but recognizes the authority of the Indian Council to dispose of such rights, with congressional approval, for the benefit of the nation, as a whole."

Parker v. Tonawanda Board of Seneca Indians, decided August 18, 1931, in the Supreme Court of New York, unreported, did involve the question of the validity of a lease here in question, and the court did hold that the lease was valid. The decision seems based mainly on the holding in Jemison v. Bell Telephone Co., supra. It is not in accord with the view here taken.

In this District in United States v. Charles, D.C., 23 F.Supp. 346, 348, Judge Burke said: "The Tonawanda Band, being a distinct tribe, is under the guardianship of the United States and thereby entitled to its aid and protection. * * * Until such time as Congress sees fit to change it, any interference with it either by state legislation or by extension of the jurisdiction of the state courts over internal affairs of Indians on the reservation is an unlawful interference with a governmental function." I call attention also in this connection to People ex rel. Charles v. Blackchief, D.C., 8 F.Supp. 295, 296, decided by this Court. This related to the Tonawanda Tribe, and it was there said: "It has been repeatedly said by this court that it is its view that the federal government has the paramount right to take jurisdiction over the Indian Nations or tribes. * * * However, the federal authorities acting under statutory right have not sought to regulate the administration of the affairs of the Indians, but have recognized the right of the state court to do this."

United States v. Wright, 4 Cir., 53 F.2d 300, 301, and Poole v. United States, 9 Cir., 97 F.2d 423, present situations which are in certain respects comparable. Each involved a question regarding the authority of the United States over Tribes of Indians with respect to the eastern Band of the Cherokee Indians in North Carolina. The Cherokee Band was no less outside the limits of Indian country as defined in Section 1, supra, than the Tonawanda Tribe.

In the Wright case we find this expression: "The fact that the Eastern Band of Cherokee Indians had surrendered the right to their tribal lands, had separated themselves from their tribe, and had become subject to the laws of the state of North Carolina, did not destroy the right or the duty of guardianship on the part of the federal government. The fact that they constituted a community of these aboriginal people who were wards of the government was sufficient basis for the exercise of the power; and to what extent the power should be exercised was for Congress to decide." [53 F.2d 306.] Numerous cases there cited are pertinent to the matter considered here.

Jurisdiction over the Tonawanda Tribe has been taken by the federal government by the enactment of numerous statutes other than Section 177, supra. Various of these are found in Title 25, Chap. 1 et seq. U.S.C.A. These federal statutes relative to the sale of intoxicating liquors and the jurisdiction of the District Court over certain criminal offenses are applicable to the Tonawanda Tribe equally with the other Indian Tribes. Section 241, Title 25 U.S.C.A. and Sections 212 et seq., Title 25 U.S.C.A.; Section 548, Title 18 U.S.C.A.; see also Section 81, Title 25, supra, and various other provisions of the Indian Law, Title 25 U.S.C.A.; see also United States v. Hamilton, D.C., 233 F. 685; United States v. Boylan, 2 Cir., 265 F. 165.

It is the claim of the government that Section 397, Title 25 U.S.C.A., is applicable here. That section provides that: "Where lands are occupied by Indians who have bought and paid for the same, and which lands are not needed for farming or agricultural purposes, and are not desired for individual allotments, the same may be leased by authority of the council * * * for a period not to exceed * * * ten years for mining purposes * * * and upon such terms and conditions as * * * may recommend, subject to the approval of the Secretary of the Interior." This section first appeared in Chapter 383 of the Laws of 1891, 26 Stat. 794, which amended Chapter 119 of the Laws of 1887, 24 Stat. 388. The statute of 1887 was entitled "An act to provide for the allotment of lands in severalty * * * and to extend the protection of the laws of the United States and the Territories over the Indians, and for other purposes." Section 8 of Chapter 119, supra, provides that such act "shall not extend * * * to any of the reservations of the Seneca Nation of New York Indians in the State of New York." Section 8 was not amended or repealed by the amendment

of 1891. This section was carried into the U.S.C.A. as § 339. It relates only to lands allotted under the allotment law. The original section 8 had no reference to section numbers as they appeared as referred to in § 339, and it seems evident that these section numbers were added without considering the amendment of 1891. It appears, therefore, that the Seneca Nation of Indians is excepted from the provisions of this so-called allotment act as amended and that section 397 relates only to reservations where there are "allotted lands" under the provisions of the allotment act.

■ Even though it be held that Section 8, supra, has been repealed, there is nothing to show that any allottee of any of the leased lands comes within the description in Section 397 of those whose land could be taken for mining purposes. It does not appear that the lands involved herein are occupied by Indians who have bought and paid for the same which "are not needed for farming or agricultural purposes, and are not desired for individual allotments." It applies only to lands which are "not needed for farming or agricultural purposes, and are not desired for individual allotments," and it does not appear that the leased lands are not so desired.

■ While the defendants concede that the claim of laches or estoppel is not available against the United States, and about this there can be no question, it is argued that the United States by action and inaction has put a construction of validity on the statutes enacted by the State of New York by which it (federal government) is bound. Attention is called to the length of time during which income from the gypsum mining on the Tonawanda Reservation has been distributed or paid to the Indian Agent; to the fact that for over 50 years the authority of the state to prescribe conditions for the mining of gypsum has never been questioned by the federal government; that in one proceeding a representative of the federal government asserted the rights of the government to gypsum royalty money; that the Department of the Interior and Commissioner of Indian Affairs have taken an attitude on certain things purported to show that the United States government had no interest in those leases; that the acts of the Interior Department for upwards of 50 years has placed the construction of the New York State laws as claimed by the defendants. These asserted acts and conditions bear closely on the question of estoppel. It does not seem to me that such acts have any binding force against the United States. In Cramer v. United States, 261 U.S. 219, 43 S.Ct. 342, 346, 67 L.Ed. 622, it was said: "Neither is the government estopped from maintaining this suit by reason of any act or declaration of its officers or agents. Since these Indians with the implied consent of the government had acquired such rights of occupancy as entitled them to retain possession as against the defendants, no officer or agent of the government had authority to deal with the land upon any other theory. The acceptance of leases for the land from the defendant company by agents of the government was, under the circumstances, unauthorized and could not bind the government; much less could it deprive the Indians of their rights." See also Heckman v. United States, 224 U.S. 413, 32 S.Ct. 424, 56 L.Ed. 820. Proof of the action or the inaction of officials of the government may be competent as assisting in the construction of the meaning of an act, where such meaning is doubtful, but it is not so where the law, as here, seems clear. Blanset v. Cardin, 256 U.S. 319, 41 S.Ct. 519, 65 L.Ed. 950, and other cases cited by the defendant Gypsum Company are not in point for the reason last stated.

■ It appears from the statement in defendant's brief that the question of the right of the government to bring suit as guardian on behalf of the Indians is not questioned. The claim is to the contrary as to the right to bring this particular action. Finding that Section 85, supra, was not effective to permit the execution of the leases in question; that the state had no authority to authorize the execution of these leases; and that the government has exclusive jurisdiction both by reason of this general authority over the Indians and by reason of the provisions of Section 177, supra, and further that these leases never had the approval of the Council of the Tonawanda Reservation, it follows that the court has jurisdiction over this action.

■ The government asks an accounting and for damages. In its brief the government states that on this motion we need consider only whether the leases were invalid. Assuming this to be true, it is believed that the court now should determine the nature or extent of any accounting. In view of the long continuation of these leases, the fact, assumedly, that payments have been made in accordance therewith,

and that no action has been taken by the government, in denial of the right of the state to authorize such leasing, it seems to me that this accounting should be limited to a time commencing from the institution of this suit. Of course, this is all assuming that payments according to the terms of the leases have been made up to that time.

### Conclusions of Law

1. That the deed of conveyance in trust executed by the Secretary of the Interior of the United States on February 14, 1862, to the State of New York in pursuance to the Treaty entered into between the Tonawanda Band of Indians and the United States under date of November 5, 1857, and supplemented by the Treaty of June 4, 1858, conveyed no title in New York State.

2. That the aforesaid conveyance resulted in a mere "dry" or "passive trust" and that under it the State of New York was not authorized to sell, lease or dispose of any of the property of the Tonawanda Tribe of the Seneca Nation.

3. That Section 85 of the Act of the legislature of the State of New York approved February 17, 1909, titled "An Act in relation to Indians constituting Chapter twenty-six of the consolidated laws" of New York, is null and void.

4. That the option executed to Sadie E. Nobles on June 1, 1921, by James Kelly, district attorney for the County of Genesee, purporting to act under authority of Section 85, supra, and purporting to grant the right to prospect and explore for gypsum on a portion of the Tonawanda Reservation, and granting an option to mine therein, and the written instrument exercising such mining option under date of April 26, 1926, are null and void.

5. That the instrument purporting to give the National Gypsum Company the right to mine, quarry, crush and remove plaster rock from the lands of the Tonawanda Reservation executed on June 21, 1936, by William H. Coon, as attorney for the Tonawanda Tribe of Indians, is null and void.

6. That the plaintiff is entitled to judgment as a matter of law.

7. That the plaintiff is entitled to an accounting as and from the date of the commencement of this action.

Let the plaintiff submit further findings, if desired, for approval.